1    Q    ....dismissal?  This concerns your first EEOC

2         complaint I mean?

3    A    Yes.

4    Q    This was against Barbara Moyer and NMC?

5    A    Right.  This is where I advised them that I've come

6         to ah, friendly agreement, amicable agreement with

7         the NMC and attached the ah, recommendation for

8         settlement.

9    Q    The agreement?

10   A    Right.

11   Q    Um, when you filed this EEOC, did you name Barbara

12        Moyer as a....

13   A    Yes.

14   Q    ....defendant?  Or as a respondent?

15   A    I remember it was Northern Marianas College and then

16        they list down below who exactly and I listed

17        Barbara Moyer.

18   Q    Do you know if she was ever made aware of this

19        grievance?

20   A    Yes.  From the standpoint of ah, we were brought

21        into a meeting ah, prior to the ah, this filing and

22        I asked for some support and ah, you know help

23        because we were getting a pretty raw deal and she

24        just basically shine me off, so.

25   Q    But did -- this was, that meeting was in response to

-91-

1           your EEOC complaint?

2     A     Prior to this, I believe I ah, asked for a meeting

3           with her and Human Resources and they set it up to

4           get this thing settled....

5           MR. SMITH:  Right.

6     A     ....on administrative level.

7           MR. SMITH:  Before filing your EEOC.  Before.

8     A     If I can, yeah--

9           MR. SMITH: Okay.

10    A     If I--

11          MR. SMITH: To try to prevent that.

12    A     Right.

13    Q     Okay, and that didn't happen, or she didn't -- she

14          didn't--

15    A     There seem to be even more after that, ah like lack

16          of budget support and ah, comments made that I had

17          witnesses to the effect.

18    Q     What um -- and who are those witnesses?

19    A     Ah Mr. Lino Santos, my instructor.

20    Q     Lino?

21    A     Santos.

22    Q     Is he still on island?

23    A     Yes.

24    Q     Um, in this EEOC complaint, ah do you know after you

25          filed it if this ah, Barbara Moyer was ever made

1    aware of its filing?

2  A  Um there -- there was ah -- ah you know, I can't say

3     if they met what? But from the standpoint of um,

4     Human Resources said they'll meet with Ms. Moyer and

5     then the college was prepared I guess ah, for EEOC

6     to take the next step, but at the point, the

7     president at the time stepped in.

8  Q  That's Agnes McPhetres?

9  A  Agnes McPhetres and asked if I would be willing to

10    sit with her and -- and ah, get this matter settled

11    and I said, yes, I would, and so it was just Agnes,

12    myself and, I believe, Kohne Ramon.

13 Q  Do you know if Agnes ever discussed it with Barbara

14    Moyer?

15 A  I can't, I can't say for sure.

16 Q  Um I was looking at this attachment that you had to

17    this letter which is the agreement with you and --

18    and the President, Agnes....

19 A  Uh-huh?

20 Q  ....McPhetres? Um, and it appears that there's no

21    mention of Ms. Moyer in this letter or in this

22    agreement?

23 A  Yeah, the only ah, indication was I had an

24    additional statement to be made that ah -- ah that

25    training would be conducted for sexual harassment

-93-

```
1              for both male and female employees and that was

2              added.

3       Q      Okay, but it does not -- it does not ah, mention

4              Ms. Moyer, in terms of that's who's supposed to get

5              the training?

6       A      It did not, yeah directly mention her name.

7       Q      Okay, but it is her that you have stated here you've

8              had the main issues with?  Or the main problems

9              with?

10      A      Yes.

11      Q      Do you know why um, you and Ms. Moyer have

12             apparently had or allegedly have so many issues?  Or

13             disagreements?  Or why she has not treated you as

14             you believe you were entitled to be treated?

15      A      Um, I'm not a, ah -- when you work in educational

16             administration, there is a lot of competition and ah

17             -- ah, like professional jealousy and everybody is

18             comparing their doctorates and -- and that I had

19             competed for jobs ah, with her, but it all pretty

20             much, it basically started when ah, she was removed

21             as the Chairman of the Academic Council?  And ah,

22             the Board requested that because of some incidents

23             that happened with her and other people?  So she was

24             removed and I was a member of the Academic Council

25             at the time and ah--
```

1    Q    She was the head of that council?

2    A    Yeah, she was the chairperson?  And--

3    Q    How was your relationship sitting together in that

4         council?

5    A    At times, it was strained because she made comments

6         about men that ah, like one time there was a

7         committee created for ah, to go to Hawaii and she

8         mentioned the people on the committee and they're

9         all women?  And Sam Gugliotta (ph.), I believe he

10        was the one who asked why weren't there any men?

11        And she said she couldn't find any competent men to

12        put on the committee, so he protested and I ah,

13        raised the issue why she would make that comment

14        because she wasn't joking and then ah -- ah later

15        with the film and TV, she bad mouthed it in a Board

16        meeting and ah, I had to ah, confront her, you know

17        with the issues and ah, the chairperson pretty much

18        asked her to leave?  And sided with me?

19             Then the next thing was this Academic Council

20        where she was removed and was somewhat embarrassing

21        because ah, basically she was ah -- from a Board

22        letter or something and we sat there and she

23        wouldn't leave, so the Council took a vote that ah,

24        we accepted the Board's recommendation.  She asked

25        us to rescind the Board's recommendation or

1      directive and we said as an Academic Council, we

2      can't rescind the Board directive ah, apparently

3      you're no longer a member of this council.  So, she

4      sat there and wouldn't leave and meanwhile the Board

5      or the council voted for a new chairperson and--

6   Q  While she sat there?

7   A  While she sat there and guess who they picked?  They

8      picked me in front of her and she -- then she

9      stormed out and I knew--

10  Q  What year was that?  When was that?

11  A  '99, 2000 time frame, something like that?  And then

12     because I knew one Board member came up to me the

13     following day and ah, he was -- he was grilled by

14     her about who did he vote for--

15  Q  Who was that?

16  A  I forget the council member.  Um anyway, ah I could

17     see a real change from that point where it got to be

18     just management like jealousy and what not into a

19     ah, problem where it affected ah, my programs and my

20     ah, trying to, you know take care of my own business

21     in my department.

22  Q  Did you ever have any dealings with her outside of

23     the college?

24  A  No.

25  Q  Family interactions?

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Nothing? |
| 3 | A | No. |
| 4 | Q | Okay.  Okay, what I'd like to do now um, is discuss with you the Third Amended Complaint which is -- portions of which are what are currently still in front of the court.... |
| 8 | A | Yes. |
| 9 | Q | ....um, and I've got the Third Amended Complaint here in case -- actually, I can get one from this discovery, this is your -- um, did you draft this Third Amended Complaint? |
| 13 | A | Yes. |
| 14 | Q | Okay, um on paragraph 5 of the complaint you say that all conditions precedent have been complied with.  Can you tell me what conditions precedent you were talking about specifically? |
| 18 | A | That I filed a EEOC complaint and was issued a right to sue. |
| 20 | Q | What is a right to sue? |
| 21 | A | It's a notice from EEOC that you have 90 days to proceed in the District Court or you no longer -- or you lose your rights to file if you don't file something within 90 days. |
| 25 | Q | Is that all that you can expect from EEOC is a ah, |

-97-

1           right to sue letter?  I mean is that -- is that what
2           you've -- is that -- is that the best you can get
3           from EEOC?

4     A     Ah in dealing with EEOC Hawaii, they -- I talked to
5           the ah -- ah investigators and the likelihood of
6           them stepping in legally is very remote because of
7           their ah, caseload.  Um and they're very frank about
8           it.  So, it's -- it was advised, you know I do speak
9           to attorneys, friends, not Mr. Aguilar at this
10          point, but they're attorneys about ah -- and
11          normally the recommendation is ah, just request a
12          right to sue and they will issue it early, instead
13          of waiting ah, for their preliminary investigation,
14          and it takes a long time sometimes, so ah, to
15          expedite and from the standpoint at the time I was
16          out of work and, you know time is costly and so I
17          just asked for a right to sue, I believe, and was
18          given this right to sue and then filed.

19    Q     Okay, and so your statement here is that basically
20          you complied by getting this right to sue letter and
21          that's the conditions you're talking about?

22    A     Yes.

23    Q     Okay, um this previous, in paragraph 6, you talk
24          about a 1998 charge of employment discrimination
25          and, again, we have discussed this briefly?  Um, but

1          again, could you state succinctly for me what the
2          basis of that employment discrimination charge was?
3          Against--
4     A    In 1999?
5          MR. SMITH: Against Barbara Moyer and NMC.
6     A    It was ah, a complaint of ah, sexual discrimination,
7          you know discrimination based on my sex.  A female
8          versus a male.
9     Q    Okay, um and how were you discriminated on the basis
10         of your sex?  In that instance?
11    A    Ah by comments she made, um her attitude towards ah,
12         vocational programs, ah--
13    Q    Now, attitude toward vocational programs?  It does
14         not sound like a sex discrimination um--
15    A    Her comment I believe was recorded and, I think
16         Mr. Santos signed off because he heard it, the
17         comments of like vocational programs normally have
18         just men in them.
19    Q    Okay, do you know why she allegedly had these ah,
20         attitudes towards men?
21    A    I'm not a trained psychologist, I don't know, um--
22    Q    Okay, you didn't see anything or you don't know
23         anything in particular?  Or you haven't witnessed
24         anything in particular?
25    A    I know she comes from a time frame of maybe fighting

```
 1            for ah, women's rights for positions and I agree
 2            with those issues, but at times ah, when you see
 3            somebody fight, you know too much and it turns in to
 4            then ah, the other side is the enemy and that's what
 5            I -- the impression I got.
 6            MR. SMITH:  Okay.
 7    A       That ah, men -- like a threat.
 8    Q       Okay, um so this charge of employment discrimination
 9            was ah -- was based on her denying ah -- ah the
10            support you needed for your programs?
11    A       I believe I listed it in that memo that I submitted
12            ah--
13    Q       Exhibit A here?
14    A       Right -- or no, other, in the front part there is a
15            memo and there are series I believe of memos and
16            things or instances of ah, things happening.
17    Q       Okay.  Can I show you this?  Can you see if you can
18            show me where?  What you're talking about?
19            MR. AGUILAR: Maybe we should go off record until he
20     finds it.
21            MR. SMITH: Yeah.
22     OFF/ON RECORD
23            MR. SMITH: Okay, what does it say?
24    A       Um VIP -- VPI, which is Ms. Moyer has shown a
25            negative attitude towards the vocational trades
```

1       program.

2           Repeated occurrences of lack of support and

3       respect for the staff which was all male?

4           Refers to Randall Nelson, she referred to him

5       as some type of coordinator whatever, distinct for

6       his position?  He was a newly hired ah, coordinator

7       in the vocational program.

8           Repeatedly refers to Lino Santos as a carpenter

9       when, in fact, he was an instructor of various

10      trades.

11          Ah Ike Masga would have his pay delayed

12      continually by this Vice President.  We have

13      repeated attempts to get him paid on time.

14          Ah, during a meeting with our entire

15      department, ah with Barbara Moyer there, she would

16      not even list my department or my name as a part of

17      the ah, unit and ah, the programs are unworthy, I

18      mean we were canceled, a lot of programs we would

19      have to lobby and get Agnes McPhetres at the time

20      she would overrule Barbara Moyer.

21  Q   Did you discuss your filing of your EEOC complaint

22      with this Randall Nelson and Mr. Linos and everybody

23      -- or Lino Santos and Ike Masga?

24  A   No.  No, I just ah -- we discussed these issues and

25      then I ah -- we got together and decided to write a

1           letter to, you know for the record and then we both

2           signed it as the director and as the trades

3           instructor.

4      Q    Okay, but you -- so you did not file your EEOC

5           complaint on their behalf, that was just on your

6           behalf?

7      A    Right.

8      Q    Okay.  If we can look at paragraph sev--

9      OFF/ON RECORD - Continued on Side B, Tape 2.

10          MR. SMITH:  ...turned over the tape, it's September

11     30th, 2004, the time is 2:38, this is a continuation of

12     the deposition.  Okay, go ahead.

13     A    You asked earlier about -- about the '99 EEOC, what

14          did I do prior and I did file, you know through the

15          local college system a EEO complaint.

16          MR. SMITH: Okay.

17     A    And it was gender based against Ms. Moyer and to the

18          Human Resources and I know for a fact that they

19          would have to contact Ms. Moyer for Board policy

20          reasons.

21          MR. SMITH:  Okay.

22     A    And we also had a letter from the entire staff at

23          the time getting this -- asking for us to be

24          transferred out of her ah -- her supervision.

25     Q    And, was that ever addressed?  Were you ever

1             transferred out?

2    A      No.

3    Q      Okay, um in paragraph 7 of your Third Amended

4             Complaint, you talk about your 2001 EEOC charge of

5             employment discrimination?  Um, you ah -- you

6             alleged that you were retaliated against and that's

7             what required you to file?  What was that

8             retaliation?

9    A      ...[mumbling - reading], the fact ah -- ah I filed a

10            new charge based on that I had in 2001 March filed

11            for a grievance and EEO and it was never heard for

12            over a year and -- and in the process, during that

13            time, I was denied chances to ah, interview for the

14            president?  Dean positions?  And--

15   Q      And it is your opinion that that was retaliation?

16   A      Yes.

17   Q      Okay, and that's what necessitated this filing of

18            this 2001?

19   A      Ah well, I filed the 2001 as an aftermath of the

20            1999 when I was for support and no retaliation, ah

21            however this retaliation was creeping back in,

22            especially with the lack of support of the film and

23            TV program which I invested a lot of time and my own

24            money, so I refiled ah, 2001, then that filing was

25            ah, basically shelved ah, until 2002.

1   Q   Um, you mentioned something I wanted to just follow
2       up real fast, you spent your own money on the
3       Pacific Rim?
4   A   Yes.
5   Q   What do you mean when you say that?  Describe for me
6       the money that you spent.
7   A   Just um, program support, buying supplies and what
8       not, some were I was reimbursed ah, and then like
9       recruiting students?  Ah spent at least a couple
10      hundred dollars on long distance phone calls,
11      getting their transcripts, um--
12  Q   Those were phone calls made on your own personal
13      phone?
14  A   Yes.  And then ah, one young lady ah, was Stateless
15      and ah, was one of our most, you know one of our
16      better students, ah she was Stateless and was denied
17      EAP and ah, so I ah -- ah paid her tuition.
18  Q   How much was that?
19  A   Around a thousand dollars.
20  Q   You paid that out of your own pocket?
21  A   Yes.
22  Q   Is that something that you -- were you related to
23      this student?
24  A   No.
25  Q   Have you done that before?

1    A    Yes, ah some students who didn't have the money to

2         buy or pay for the ah -- ah registration?  Twenty

3         five dollars?  We had Public Works people that would

4         apply for training because they knew that it would

5         help raise them up in salary and help them in their

6         job and they would come down and ah, I would not try

7         to do it directly?  Ah, I would just go over to --

8         at Admissions and take care of it?  And then later

9         on they might find out about, some did, some didn't.

10   Q    You never sought reimbursement of that money?

11   A    No.

12   Q    Strictly you did that out of the goodness of your

13        heart?

14   A    Educators never get wealthy...[chuckle].

15        MR. SMITH:  I've seen teachers in line buying

16   supplies.

17   A    Yeah.

18   Q    Um, okay, um what other money or finances or what

19        other money have you spent for that program of your

20        own, is that pretty much it?

21   A    I drove my truck, I never used NMC, I drove my truck

22        daily, my gas, everything, ah and I believe you're

23        aware of all the trips to ah, (?) studios, ah

24        various agencies.  Putting programs together is a

25        lot of leg work and ah, so those expenses, I never

```
 1              claimed and ah, just you know tires would blow out,
 2              fixing them, things like that?  Again, some of them
 3              I submitted and they were -- I was reimbursed.
 4    Q    How about if you were to talk percentages, what
 5         percentage were you reimbursed?
 6    A    Of the money that I spent?
 7    Q    Yeah?
 8    A    Twenty five, 30 percent?
 9    Q    Um, this allegation in paragraph 7, however it reads
10         at the end as if you might be alleging two instances
11         of retaliation.  Um, that you filed for retaliation
12         and then you were consequently retaliated against
13         prior to it being resolved....
14    A    Yes.
15    Q    ....is that correct?
16    A    Yeah, I filed in 2001 a new charge of retaliation
17         and then from 2001 and 2002, it not being heard
18         which according to Board policy should have been
19         heard within 30 days?  And then my deanship and
20         presidency being denied I felt I was being
21         retaliated against so I, ah got the grievance
22         finally to the table and then ah, once it was on the
23         table and there was an agreement in good faith to
24         ah, solve this matter in a management meeting, which
25         I believe we did solve the issues, and the
```

```
1              vocational programs were ah supposedly going to be
2              supported?  At that point, then I believe it was a
3              new, ah set of -- or instance of retaliation from
4              the new president who then shortly thereafter issued
5              me a letter of termination.
6     Q        So when you talk retaliation in these different
7              instances, it's retaliation for different things
8              depending on the -- retaliation from Barbara Moyer
9              because you're male, it's retaliation from the
10             president because?
11    A        I filed a ah, EEO complaint and because of this ah,
12             complaint, I'm again being retaliated for filing
13             this and it not being resolved.  You know if it was
14             a -- if it was resolved and found that I had no
15             basis, then he would have grounds to terminate me,
16             and that was a chance I took going into this which
17             all employees do, so, again, without having the
18             chance of having it fully heard and resolved, I was
19             then terminated.
20    Q        Okay.  In paragraph 8 you talk about the -- you talk
21             about personnel management not responding, um are
22             you holding NMC responsible for the lack of a
23             response?
24    A        No.
25    Q        Okay, um in paragraph 9, um you mentioned how you
```

```
1            say that it was discrimination based on sex, age,

2            and retaliation.  We've talked about some specific

3            sex situations where, you know you're all men um,

4            and this situation with Barbara Moyer.  Is that the

5            true basis?  Or was there also age and ah -- and

6            other bases and, if so, how do you -- ah how were

7            you discriminated on the basis of age?

8     A     Age?  Um I -- because of my age, it means I'm close

9            to retirement--

10    Q     How old were -- are you?

11    A     Fifty eight.

12    Q     How old were you at this time?

13    A     Fifty six.

14          MR. SMITH:   Okay.

15    A     And the fact that ah, there have been cases where

16           older guys in management who were making higher in

17           salary are kind of hub as a group and ah--

18    Q     Did you believe this was one such instance?

19    A     Ah I felt there was ah, my age played a factor

20           because they mentioned about the salary and because

21           of my age and my salary, of course, and ah, but

22           later ah, there was a ruling that we are not

23           allowed, the age I guess in court?

24    Q     You're talking in the District Court case?

25    A     Right, yeah.  So that's not a matter right now to
```

1        ah, I guess, ah--

2   Q   So, your discriminate -- your claims are sex based

3        claims is what they've -- is what they're--

4   A   Sex and retaliation.  Sex based and retaliation.

5   Q   Okay, um I'm interested in knowing, and maybe we can

6        just finish up this little series of questions here

7        and maybe quit for today, but um, what witnesses do

8        you have, you mentioned this Lino Santos as a

9        witness?  What other witnesses do you have that

10       support your allegations of sex and retaliation

11       discrimination?

12  A   Um there would be a witness list later, right?

13      MR. AGUILAR: ...[unintelligible].

14  A   Okay, ah--

15      MR. SMITH:  I'm not asking who you're going to

16  present at trial necessarily.

17  A   Oh, okay.

18      MR. SMITH:  I just wanna know who you know as

19  witnesses.

20  A   Well, I mentioned Lino Santos.  Um, there would be

21       Ike Masga.  Ah, possibly Sam Gugliotta?  Gugliotti,

22       whatever--

23  Q   How do you spell that?

24  A   G-O -- G-U-G-G-L-I-O-T-T-A?  Something like that?

25      MR. SMITH:  Okay.

1    A    Um then, ah Butch (ph.) Wolfe and Les Wolfe.  That

2         would be for the time being.

3    Q    Okay.  Do you agree that your employment contract or

4         under the terms of your employment contract with NMC

5         that you could be terminated at will?

6    A    Well, the contract stated ah, a set of conditions

7         that I knew could be challenged.  Ah I didn't think

8         I'd have to challenge them, tell you the truth, ah I

9         just had one more contract to go and I'd be done,

10        but I knew they could be challenged because we

11        talked about the fact that NMC ah, was not totally

12        autonomous like they said it was and it was based on

13        some cases, Ogden versus the college and the fact

14        that the college gets a budget completely from the

15        legislature and there's all these factors, so as

16        employees we discussed, you know what were our

17        rights and--

18   Q    When were these discussions?  Where did these take

19        place?

20   A    On campus between different employees ah, prior, on

21        and off, to '98, '99, you know 2000?  And then ah --

22        ah when President Wright came on board then the

23        discussions kind of went up a notch because there

24        was no -- none of the staff were given the

25        reorganization plan, all these things are being done

-110-

1              and -- and so, ah people were then worried about

2              what was gonna happen and ah, so my position at the

3              time, because I'd done a research, which I do partly

4              as a hobby, but people come to me for advise and I

5              said that there is ah, from my reading, civil

6              service protection and ah, some of the employees

7              said how would we go about it.  I said, well, first

8              there has to be an adverse action and ah, boom!  An

9              adverse action happened and then I pursued it.

10    Q       Did you read your contract before you signed it?

11            Your employment contract with NMC?

12    A       Yes.

13    Q       Um, did you notice that ah, termination without

14            cause provision when you signed your contract?

15    A       Yeah, I read the ah, provision that also stated that

16            we rights to a hearing, so ah, I read that.

17    Q       Okay, but you signed your contract having read that?

18    A       Yes.

19    Q       Um, but it was later on that you started discussing

20            this with these employees?  What specifically that

21            meant?  Or started talking and advising?

22    A       Yes, because of ah, there was one or two cases ah,

23            that popped up.  Ah one I believe is the Manglona

24            case?  Something else about ah, there was a ruling

25            that you can't sign away your -- your rights by

-111-

1           contract, so ah, we knew that PSS and NMC are the

2           only two agencies that had this about cause and ah,

3           we knew -- we knew both of them were challengeable.

4           So ah, again, at the time I felt, especially after I

5           got the 25,000 from the Lt. Governor and a sort of a

6           promise from the new president that the vocational

7           programs would continue, et cetera, et cetera?  I

8           had no idea, to tell you the truth, it was a shock

9           ah, September 24th and ah, so ah, at that point ah, I

10          put the challenge in writing.

11          MR. SMITH:  Okay, all right, well the time I have

12    now is 2:53, I understand, Mr. Angello, that you've got

13    to ah -- you've got some job requirements that require us

14    to--

15    A     Yeah, yes.

16          MR. SMITH:  To quit today?

17    A     I appreciate it.

18          MR. SMITH:  Um and so we will resume this ah, let me

19    get my calendar and we--

20          MR. AGUILAR:  I have a 9:30 hearing tomorrow.

21          MR. SMITH: Okay, hang on one second.

22          MR. AGUILAR: So, tentatively do it at 9:00 o'clock

23    in there, something like that.

24          MR. SMITH:  10:00 o'clock?

25          MR. AGUILAR: Okay, 10:00 is fine.

-112-

1          MR. SMITH: Okay.

2          DEPONENT:  Monday?

3          MR. SMITH:  Ah, yeah, we will resume this ah,

4     deposition of Mr. Angello at 10:00 o'clock on Monday,

5     October 4ᵗʰ, unless ah, we agree otherwise to reschedule

6     this.

7          MR. AGUILAR: Okay.

8          MR. SMITH: So, thank you, Mr. Angello, for your time

9     today.

10         DEPONENT: Okay.

11         MR. SMITH: And we'll stop for now.

12    OFF/ON RECORD - Tape 3, Side A.

13                    October 5, 2004

14         MR. SMITH: Okay, this is the resumption of the

15    deposition of Jack Angello in ah, Civil Action No. 03-

16    0014, ah Jack Angello, plaintiff, versus NMC, Northern

17    Marianas College, defendant, in the United States

18    District Court for the Northern Mariana Islands.

19         Present here at this deposition is myself, Matthew

20    Smith on behalf of the ah, defendant.

21         DEPONENT:  Jack Angello, the plaintiff.

22         MR. SMITH:  And?

23         MR. AGUILAR:  Dan Aguilar, counsel for plaintiff.

24         MR. SMITH:  For the plaintiff, okay, and the time

25    is, it's ah, October 5ᵗʰ, Tuesday, October 5ᵗʰ at 11:18

1    p.m.  We were having some, just off record discussions

2    before and there's a question I just wanna ask you as

3    long as we're talking about this, ah you had talked about

4    your contract, a new contract with NMC that was to have

5    commenced in November of 2002.  Um, was that contract

6    already executed...[coughing], already executed

7    Mr. Angello -- oh, you know what?  I wanna do, I'm sorry,

8    before I even ask that question, you can think about

9    that?  I'm gonna have you re-sworn in for ah -- just for

10   today and for the record, so hold on one second.

11   OFF/ON RECORD

12        MR. SMITH: Ah we are going to re-swear, even though

13   he ah, was sworn earlier this is a new day, so just for

14   procedural sake, we will re-swear the deponent.

15        MS. FUJIHIRA: Please raise your right hand and state

16   your full name?

17        DEPONENT: John (Jack) Anthony Angello.

18        ...[Oath administered].

19        DEPONENT: I do.

20        MS. FUJIHIRA: Thank you.

21        MR. SMITH:  Thank you, Judi.  Okay, ah Mr. Angello

22   back to that ah, question that -- that I had just posed,

23   um when -- maybe I can lead you into it a little bit

24   more, when you were terminated from NMC, ah how much was

25   left on your contract at that time?  Time wise.

-114-

1    A    Sixty days.

2         MR. SMITH:  Okay.

3    A    It was right on the ah, 60-day mark.

4    Q    Okay, had you um, received a new contract?  Or had

5         there been discussions for a new contract already?

6    A    I received an evaluation and it was satisfactory, so

7         normally with a satisfactory evaluation, it's just a

8         continuation of your employment and there was no

9         word or mention of anything about not being ah -- ah

10        allowed to continue my work there.

11   Q    Okay, okay, and you said that you had ah, with

12        retirement a new, ah or a new arrangement that was

13        to commence with it, with the starting of a new

14        contract?

15   A    Yeah, I was getting close to my retirement and I was

16        in a four-year buy-back plan and I was estimating

17        two -- a little over two years before retirement if

18        I completed my buy-back program, so I wanted to

19        double my payments and I contacted Retirement and

20        they said that it would be no problem.

21        MR. SMITH: Okay.

22   A    Just sign in the new allotment form and I'd spoken

23        to my wife and budget wise, ah we could have

24        afforded it at that time.

25   Q    Okay, we were just starting when we ah, stopped the

1          deposition last, we were just starting to get into

2          some of the allegations in this complaint, but I had

3          failed to ah, as we were getting back on

4          information, failed to get information um, on a

5          couple of other matters and I wanted to go to those

6          now.  We had talked about the different litigation

7          that you had commenced on your behalf and we

8          discussed a case ah, or an issue that was ah,

9          concerned your son.  Have you ever filed any

10         litigation on behalf of anyone else?

11    A    Only ah -- only my son, ah on the ah, cleft palate

12         situation with PSS and it was a filing in

13         conjunction with NMPASI, they took up the case, ah

14         and then, ah I did request a hearing for my daughter

15         at the college for a scholarship program where

16         Robert Torres ah -- ah we went to a hearing and she

17         wasn't then eligible for the scholarship program.

18    Q    Your -- what year was this?

19    A    Year 2000 I believe?

20    Q    2000 and your daughter had applied for a

21         scholarship?  What's your daughter's name?

22    A    Jennifer.

23    Q    Um she had applied for a scholarship at NMC?

24    A    At the Scholarship Office.  Not NMC, I'm sorry.

25         MR. SMITH: Okay.

1    A    CNMI Scholarship Office.

2    Q    And she had been denied?

3    A    She -- yeah they -- she skipped her junior senior in

4         high school and she was accepted as a first full-

5         time ah, student, regular student at that age and

6         when she applied for the scholarship, ah she was

7         approved and later on they said that she was not

8         approved because she didn't have a high school

9         diploma, ah but it didn't exactly say that in the

10        policy, so I just wrote a letter and they asked me

11        to come in and Robert Torres ah -- ah heard of the

12        case and he wanted to ah, go there and help my

13        daughter and she ah, explained the situation and she

14        was fully accepted into the college, counselors from

15        both the high school and the college they approved

16        her being there.  And, at that point, the chairman

17        ah, said fine, go ahead and grant her a scholarship.

18        MR. SMITH: Okay.

19    A    And what they saw, they saw the wording was ah,

20        vague and so later on they changed the wording to

21        what they wanted.  I believe now you have to have a

22        high school diploma before you're eligible for the

23        scholarship.  Prior to that, it was just high school

24        diploma or other ah, qualifications and that's what

25        she fell under.

-117-

1    Q    Did um, Robert Torres actually file any litigation?

2         Or this was all just done after your letter and then

3         negotiations?

4    A    Yeah -- yes.

5    Q    Okay, how about ah, your wife--

6    A    Also--

7         MR. SMITH: Oh, go ahead.

8    A    Yes, ah my wife ah, there were a series of labor

9         complaints, ah--

10   Q    What is your wife's name?

11   A    Leonora.

12        MR. SMITH: Okay.

13   A    And we basically challenged ah, a company from the

14        standpoint of a ah, it would not ah, hire her in a

15        position and they hired a contract worker and she

16        was a U.S. ah, resident of the islands, so it was

17        contrary to the public law ah, on hiring of ah,

18        preference -- preferential law -- preferential

19        hiring statute?  So, after we went to a hearing, ah

20        Labor took her case and ah, they represented my

21        wife.

22   Q    Which Labor is this?

23   A    CNMI Labor.

24        MR. SMITH:  Okay.

25   A    And, ah she prevailed.

```
1    Q    When -- when was this, what time -- what year was

2         this?

3    A    '98, '99, something like that?  Time frame?

4    Q    Okay--

5    A    It could have stretched into 2000 because it was--

6    Q    Who was -- who was the complaint against?

7    A    Louis Vuitton.  Labor had her go to the Grand Hotel

8         and--

9    Q    Labor directed her to do that?

10   A    Yeah, they ah, put her on a list and then sent her

11        out to these ah, interviews through their placement.

12        Ah Louis Vuitton, Caronel and -- Caronel watch

13        company, I believe.

14   Q    Okay, what was your role in -- in ah -- in that

15        litigation, did you have one?

16   A    Ah support and ah -- just giving my wife support.

17        She was out of work and -- and I knew that she was

18        wrong so I just gave her support and ah--

19   Q    Are you the one that directed her to Labor?

20   A    Ah Art, I believe was this guy's name, I was at the

21        college and the guy who worked in Labor who did this

22        was at our college...[unintelligible] our vocational

23        program and ah, he -- he knew of it and I asked him

24        would ah, she -- would that be a case worth

25        pursuing, he said yes because it involved the
```

```
 1              preference because he knew she was Filipina, but
 2              when he found out that she had a U.S. Green Card,
 3              they call it, she said -- he said that she was
 4              eligible, why was she turned down and so he wanted
 5              to ah, look at it and then we gave him the documents
 6              and, from there, they took her case on.  I think it
 7              was a test case because it's used ah -- ah by the
 8              Labor in matters of ah, people who are denied
 9              employment who are ah, should be given preference.
10              As long as they're qualified.  That was the matter
11              that we ah, realized, as long as the person is
12              qualified, U.S., they have a certain preference over
13              contract workers.
14    Q    How did it -- how did the case actually begin, she
15              had gone to and sought employment from Louis
16              Vuitton?
17    A    She was working at Louis Vuitton and ah, she applied
18              for a supervisory position.
19    Q    That's a Louis Vuitton store on Saipan, right?
20    A    ...[inaudible reply].
21         MR. SMITH:  Okay.
22    A    And then ah, Louis Vuitton ah -- ah denied her the
23              position and then Labor took the case and then ah,
24              from the case we filed in court.  We did file in
25              court on Louis Vuitton, on the Louis Vuitton matter.
```