1   Q   Okay, ah--

2   A   And then--

3   Q   And what is the -- do you know an -- do you have

4       that amount of loss of professional earnings?

5   A   Fourteen months?  I earned about 52 a year?  So, two

6       one six, about ah, 60 plus?  In actual ah, earnings.

7   Q   Okay, um you make the allegation too in paragraph 95

8       that you have suffered and continue to suffer

9       irreparable injury.  Um, what basis do you -- do you

10      claim that -- that ah, you have suffered irreparable

11      harm?

12  A   Um, well, certain things you can't undo ah, what was

13      done to me on September 24th.  Ah health?  There's

14      been some problems I've been battling um, that could

15      be damaging certain things in my body.

16  Q   New and unique strictly because of this termination?

17  A   Yeah, I can relate to ah, you know aggravating ah,

18      loss of my -- my hair?

19      MR. SMITH: Talk to me about it.

20  A   No, I...[chuckle]--

21      ...[laughing in background].

22  A   The ah -- ah yeah, the fact of ah, also a ah, you

23      know I can never, I guess have that same

24      relationship I have with the college that I had

25      prior to September 2002.  Even according to your own

-216-

1          words, they consider me now disloyal and that I

2          don't care about the college, so that would never --

3          from what they say that will never be removed, so ah

4          that hurts, you know for me personally and

5          professionally because I enjoyed tremendously

6          working at the college and I wanted to finish off

7          until I retired there at the college.

8             Also the fact that they continue -- continued

9          to deny the ah -- ah the existing of Civil Service

10         protections and just continues to provide, you know

11         new injury to people, ah so--

12   Q   But that's other people besides yourself, correct?

13         Are you making a claim for injury to others?

14   A   No, myself.

15         MR. SMITH: Okay.

16   A   Yeah, in this particular, I'm not -- other people

17         have their own ah, claims that they want or whatever

18         they take.

19   Q   Do you believe that your injuries can be compensated

20         in the form of money?

21   A   Ah, yes, with ah, my retirement program, ah which is

22         somewhat -- somewhat it's very important to me at my

23         age. As matter of fact I still have a young family

24         that ah, need me and I wanna be able to provide for

25         them in the future because I'm quite older than ah,

1           my wife and my kids are fairly young for my age.  Ah

2           it's very important.  So, again, the compensation,

3           of course, will take care of the damage and, of

4           course, I want it with the reinstatement factor from

5           the standpoint of my retirement so I can

6           legitimately, you know get that vested service back.

7     Q     Okay.  In paragraph 97, ah you talk about Barbara

8           Moyer or alleged that, you know her continued

9           behavior ah, continued in 2001, 2002, and then that

10          the Board and the college ah, did not take

11          corrective actions.  Um, when you allege this

12          failure to take corrective actions, is that just

13          strictly their failure to have what you considered

14          was manual -- mandated ah, sexual harassment (?)?

15          Or sexual harassment training?

16    A     That and ah, to have -- have her meet with ah, us,

17          you know meaning the staff of my department?  We all

18          wanted to meet?

19    Q     No, was that part of what was promised?

20    A     In what?

21    Q     In your agreement?

22    A     With?

23    Q     With ah, your settlement of your--

24    A     '99? ...[cleared throat], excuse me, no -- yeah,

25          well, Agnes in the discussions said she wanted, of

1           course, any president of the college, she wants

2           people to meet and ah, work things out and, you know

3           support each other. And I said I'm fine with that,

4           ah and ah, so ah, because being a president she

5           can't follow every department, you know she has so

6           many departments, so ah, she assumes that people

7           would help each other. So, again, the ah -- she

8           took corrective actions and for a while there it was

9           peaceful, but then ah, she left.

10          Ah it was brought out during our hearing, when

11          we were terminated, at the Legislature that Barbara

12          Moyer was instrumental partly of getting Agnes

13          removed because Heinz, ah Congressman Heinz

14          Hofschneider brought that up. So, ah we knew that

15          we lost some -- somebody, a president, a good

16          president because of ah, some behind the scenes

17          activity from Barbara Moyer, so it was ah, somewhat

18          unsettling.

19          And then after she left, then the retaliation

20          and the harassment cranked up a notch and ah -- and

21          it was a problem and ah--

22   Q  Well, like how did the -- how did the harassment

23       crank up?

24   A  The um, you know no budget, denial of ah, requests,

25       ah putting payments you know, for my adjunct

```
 1              instructors, they weren't paid on time, ah travel
 2              was denied, um just a continuous thing of ah--
 3         Q    And the only reason -- your allegation is the only
 4              reason that that type of conduct occurred was to
 5              harass you?
 6         A    Isn't that harassment?
 7              MR. SMITH:  I'm asking you.
 8         A    I think it's a form of harassment in the fact it ah,
 9              not only from the standpoint of management, it also
10              entered into the area of sexual harassment and I
11              have witnesses to that effect--
12         Q    How -- how is denying a um -- or not funding a
13              program for whatever reason sexual harassment?
14         A    Well, if it's directed at a particular person, then
15              -- and some of the ah, motivation behind it is that
16              the programs are worthless like she told me in front
17              of my face, in front of Lino, and I asked her why
18              she thought they were worthless and she says, well,
19              who do you have in your programs.  And, after that,
20              Lino walked away upset and I just looked at her and
21              I said, you're saying the wrong thing and she just
22              walked off.  So, we knew what she meant, ah because
23              we had the prisoners inside the ah, lab room and ah,
24              we had indigenous males, that's all we had in our
25              programs at that time.
```

```
 1   Q   Did she, specifically, say because they are male?

 2   A   Not that they are male, but she says, ah look who

 3       you have in your programs.

 4   Q   Did she mean prisoners?  Or did she mean males.

 5   A   Since we had only males in that program that I was

 6       doing at that time and she was looking that

 7       direction I assumed she meant males because that's

 8       all that was in there.

 9   Q   But were they also only just prisoners?

10   A   Were in there at the time?  Yeah, we had our prison

11       program on campus and we were in the lab down below

12       and she had walked by ah, and I had approached her

13       about something she had ah, disapproved and ah --

14       and she said and -- and, like I say, the fact that

15       she complained that they weren't paying tuition, to

16       that effect, you know I heard that come up and, to

17       me, it was unsettling because you know, they're

18       prisoners, how can they, and we were given a mandate

19       ah, by the ah, constitution to ah, help rehabilitate

20       people, you know train people, you know residents

21       and so, I asked, then should we let them out on

22       Friday so they can go upstairs so they can pay the

23       tuition, I guess if they wanted that, so.

24   Q   Is it a valid excuse that ah, the college needs or

25       wants tuition paying individuals?
```

-221-

1    A    Well, yeah, according to policy ah, do you think the
2         Man Amko should pay tuition?
3         MR. SMITH:  I'm asking you.  Is that a valid excuse.
4    A    That they want tuition from people?
5         MR. SMITH:  Yeah.  That they would deny or not fund
6    certain programs because they -- they couldn't provide
7    for themselves.  Is that a valid reason.
8    A    To me, it's a ah -- ah unjustifiable reason in that
9         they don't read their own -- their own statutes and
10        the Legislature's budget that we are a completely
11        subsidized college.  Ah the Legislature pays for
12        every position paid, we have no rent, top of that we
13        have EAP scholarship money and they want us to
14        educate people and certain people do not pay
15        tuition.  Man Amko don't pay tuition.

16        Ah, and I had an MOU signed by Agnes ah, and
17        then part of that MOU was they would not be paying
18        tuition.  So, it was ah, agreed upon, so, for me, to
19        have to confront other management people there and
20        that they want tuition, to me was invalid and
21        unjustifiable and undue pressure on our programs.
22        So, ah if proved to them that, like the film and TV
23        program, I netted the college ah, $25,000 net, ah
24        our take, and I didn't receive any of that money
25        because I explained to them if I make 25,000 in one

```
 1          program, it helps subsidize another program that
 2          doesn't generate--
 3     Q    Are you talking about the 25,000 you got from the
 4          Lt. Governor?
 5     A    No.  Tuition and fees from the first semester, I did
 6          the numbers, and after ah, our whatever debts that
 7          we had ah, the college netted ah, a little over
 8          20,000, ah 20 to $25,000.  And, normally, that
 9          money, since it was generated out of my department,
10          I should get a percentage back and I got zero and I
11          brought that issue up.
12               So, again, I think it was unfair that they
13          would take all that money and not give any of it
14          back, plus it was unfair for them to put this stress
15          factor in that they wanted the prisoners to pay
16          tuition.
17               Because they -- they don't understand this
18          concept I had about negative impact.  A prisoner not
19          rehabilitated if you just let him go out back in
20          society, he's frustrated and he's unskilled, he's
21          gonna rob again.  You know it's a known factor.  I
22          don't know the (?) numbers, but the costs of -- now,
23          I'm in the AG's Office, Criminal Division, the
24          amount of money that the CNMI spends on criminal
25          activity is just staggering and this money could be,
```

1       I think, better spent on positive things, so it's

2       ironic that now I'm in a position that I see ah,

3       what happens with the lack of education.  I read

4       reports, statements, and a lot of the reasons why

5       people do things is because they're just frustrated,

6       they're out of work, and ah, so I thought I was

7       providing ah, some light at the end of the tunnel,

8       you know for some of these guys and quite a few of

9       them that we trained are -- are in college and doing

10      things and got jobs, so it does, it works with

11      anybody.  So, again, ah--

12  Q   But your -- it's your allegation that their failure

13      to understand this negative ah, costs idea of yours,

14      ah was -- was a -- was in actuality just sexual

15      harassment against you?

16  A   No, the sexual harassment is a different, you know

17      ah, that's just lack of management skills,

18      knowledge, to me.  Ah, so, ah that part of it, ah so

19      it's different from the other instances of -- of

20      words, expressions, things said, ah attitudes which

21      were the sexual harassment part.  Because I said,

22      you know they didn't take corrective actions, I mean

23      their management style, plus the ah, you know the

24      sexual harassment is just one aspect of it.

25  Q   Paragraph 100, um you ah, alleged that the Board of

-224-

1           Regent, in demonstration of their authority,

2           instructed Wright to freeze all hires?  Ah, what

3           basis do you allege that?  That they -- that they

4           instructed him to freeze all hires.  Why do you make

5           that allegation.

6     A     I think I'm referring to ah, some of the positions

7           vacant...[pause], yeah, I'm -- I'm establishing the

8           fact that the Board does have authority over the

9           hirings and termination of employees.

10    Q     And, how are you--

11    A     In February of 2004, there was a meeting, there was

12          a directive ah, issued and it's still on the website

13          they have under Human Resources because I checked

14          and it says, ah positions are frozen, ah per the

15          directive of the Board of Regents.  So, you know the

16          contention that the Board does not involve itself in

17          hiring and firing is absurd because they've publicly

18          shown this in their statements, their meetings and

19          ah, in the website.

20    Q     Okay, paragraph 110 of your third amended complaint?

21          Ah, what's your basis for alleging that each

22          defendant, in their individual capacities, violated

23          this 42 U.S.C. 1983?

24    A     Was this ah, cause of action dropped?  Can you

25          refresh me?  Remember, ah certain parts were

-225-

```
 1           dropped?

 2           MR. SMITH:  Yeah, I have to go through my notes.

 3     A     If it was dropped, I think it would be a moot

 4           question.

 5           MR. SMITH:  That's all right, even moot, just go

 6     ahead and just answer, moot or not moot.

 7     A     Well, again, I've alleged both in their professional

 8           and individual capacities, so in this particular

 9           instance, it was in their individual capacity

10           violated 1983 -- which prevents, ah -- prevents --

11           prohibits deprivation of a person's due process,

12           rights and privileges.

13     Q     What due process then?  What -- what ah, this is

14           because you believed that your termination should

15           have gone through this three month period, this RIF

16           procedure, through all of the--

17     A     It should have gone through a ah, with cause

18           procedure?  Ah, like the Civil Service Commission

19           ah, prescribes that we have those protections?  So,

20           again, they ah--

21     Q     During your time at NMHC, did you -- or NMC, did you

22           ever ah -- ah deal with the Civil Service

23           Commission?

24     A     Ah only, I deal with them on ah, personnel?  Trying

25           to get jobs?  And then--
```

1    Q    For the college?

2    A    No, for ah, students.  And then ah, we spoke of ah,
3         policies?  And that's what got me going on this
4         information about, you know if -- if ah, NMC
5         employees were covered, because I had gone through
6         an experience with PSS that I contended that they
7         were covered and ah, so it carried over to NMC and
8         ah, I just -- I had done research ah, on this matter
9         and talked with other people at the college because
10        we were concerned about our ah -- ah jobs from the
11        standpoint of things were changing at the college
12        after Agnes left, um, it was sort of like upheaval.
13        Like a new president, then he resigned, an interim
14        president, and they're looking for another president
15        and then ah, so this is just natural.  You know,
16        it's employees, people ah, just discussing and
17        trying out -- or finding out what our rights were
18        and most of us said we hope we don't have to find
19        out, you know to challenge it, so ah, I end up
20        having to challenge it.

21   Q    What property interest do you believe you have --
22        you have or had in your job at NMC?

23   A    That was my property interest.  My job.

24   Q    What type of a property interest in that, you had
25        the right to that job for the rest of your life?

-227-

1    A    No.

2    Q    Okay, what, explain to me that property interest in

3         your job--

4    A    I had a right to that position as long as I was

5         doing a satisfactory job until such a time I retired

6         or I decided to leave.  So, I would say that's my ah

7         -- my property interest.

8    Q    So, in your opinion, the only way is if you had --

9         could have been terminated for cause?  Or if you

10        voluntarily resigned, those are the only two ways--

11   A    Or retired.

12   Q    Well, resignation or retiring.  Those are the only

13        ways that your contract have could been terminated

14        at NMC?

15   A    Legally, yes.

16   Q    Okay, um and it wouldn't have matter if the two year

17        contract had come up?

18   A    Again, ah the fact that I was on the wrong contract,

19        ah and I went in there and asked and they said,

20        don't worry about it.  Ah--

21   Q    Who said that?

22   A    HRO.  Just a--

23   Q    Who?  Who in HRO?

24   A    Some assistant long time ago I asked and so it was

25        like, um just, you know we just have to do these

-228-

1        things, I mean I guess, it's a part of the routine,

2        so to speak and then I'd go -- because you know you

3        have a job out here and ah, people talk about why

4        only NMC employees and PSS employees who are mostly

5        outsiders, Statesiders, don't have certain

6        protections according to certain management people

7        at NMC and PSS, so you wonder ah, is there -- are

8        there protections. So, I rested my protection on

9        the law and ah, the policies. Ah, and I found out

10       later that I cannot contract away my rights and it's

11       been already tested in court and it's come back in

12       the Manglona case, 1 believe, that I cannot contract

13       away my rights, so--

14  Q   So, do -- do -- in essence, is your argument that

15       the language in -- in your con -- that you're --

16       what's stated in your contract is not relevant?

17       It's only what the law says? It's only what ah,

18       Civil Service say?

19  A   Parts of the contract that are contrary to law and

20       statute are ah, irrelevant and ah--

21  Q   What about those provisions that are not contrary?

22  A   To law?

23       MR. SMITH: Right.

24  A   I guess if they stood up in court of law, then they

25       would be relevant.

1    Q    Okay, ah such as the end of a term of a contract,
2         would -- that's not relevant, if I'm understanding
3         you right based on your -- your statement that you
4         could be terminated for cause, ah or you could
5         retire or resign, that's the only way your contract
6         could end.  What about if it just expires.  Under
7         the law you don't see that as -- as a--
8    A    Again, it's a question of law and I can't say at
9         this point because it hasn't been ruled upon by a
10        judge.
11   Q    Okay.  Turning to your prayer for relief?  Just for
12        some clarification on some of these figures that you
13        placed in here?  Um, you -- you alleged that you
14        have suffered loss of benefits in the amount of a
15        $100,000 from sex discrimination?  On what basis do
16        you ah, make those allegations to present those
17        figures?  How did you come up with that figure of a
18        hundred thousand dollars?
19   A    The actual ah, payroll?  Ah--
20   Q    Which is how much, a hundred thousand?
21   A    No, that was about 60 -- about 65?  Plus I averaged,
22        ah I looked at my payroll, I was averaging about 58
23        a year due to ah, I don't know if it's overtime,
24        certain compensation that we were getting, so it
25        could be like close to 70 in ah, actual earnings and

```
1              then I had a ah, life insurance policy? I think it
2              was worth about 50,000?  Then after I was
3              terminated, it just disappeared?  So, what's that, a
4              120,000?  And then ah--
5        Q     You would have had that benefit?  That life
6              insurance policy would have stayed?
7        A     As long as I was employed.  It's a continuous thing.
8              Once you don't make your deductions, then it stops.
9        Q     Okay, but because you didn't die, um does that mean
10             that ah, the 50,000 should be tagged on still?
11       A     Um, well, it's like a continuous thing.  If I was
12             still employed there and go into retirement, I'd
13             still have that and I consider that, you know a
14             benefit.
15       Q     Is that a whole policy?  Whole life policy?
16       A     Um I -- we didn't get any money -- you don't get any
17             money back from it, it's just a continuous ah--
18       Q     Just a term?
19       A     Yeah, I think it's, yeah, term.
20             MR. SMITH:  Okay.
21       A     And then, I think annual leave?  Ah we accumulate
22             annual leave?  That also relates into money?
23       Q     Did you -- were you able to get your annual leave
24             upon....
25       A     Yeah.
```

```
1    Q    ....termination?

2    A    Yeah, but I'm talking about the time of my

3         unemployment time, I lost--

4    Q    That you would have accrued additional annual leave?

5    A    Yeah, approximately a month and a half which relates

6         to what, another ah -- ah 5, $8,000?

7    Q    Okay, what doctors have you consulted with regarding

8         this $50,000 figure for psychological pain and

9         suffering?

10   A    Physical and psychological?  Ah, I can say the

11        Pacific Care, ah doctors.  Um, CHC.

12   Q    How did you come up with this figure of $50,000?

13   A    From the standpoint of present and in the future?

14        Ah, because I still ah -- ah if I talk about certain

15        parts of my termination, I notice my eyes will water

16        up and I know there's hidden pain there and it just

17        -- it bothers me.

18   Q    Is there more than just regular life pain there? I

19        mean is that just what we all go through in life?

20   A    If it's normal to be terminated in that fashion? I

21        guess we can consider that normal.

22   Q    No, I mean, the eyes watering up over different

23        events in life.  I mean is that, is it anything --

24        is that excess -- are we talking normal life

25        relations and experiences and stress?  Or are we
```

```
 1           talking something differently.
 2     A     I think it's related to a ah -- ah a which would be
 3           an abnormal experience?  I mean, ah the abrupt
 4           termination?  The way it was done?  Because I've
 5           been -- I've left other jobs ah, that I like, but
 6           because of moving or whatever the case and if you
 7           think about it there's certain regret, but this is
 8           quite different.
 9     Q     What physical manifestations do you have of this ah
10           pain and suffering?
11     A     Ah I grind my teeth.  At night my wife asked me to
12           stop and I have nerve damage I have to go see a
13           dentist I think it's next week.  Um--
14     Q     Is that something that is brand new to -- were you
15           grinding your teeth before you were terminated?
16     A     No, not ah, just on normal stress, you know at a job
17           where ah -- but in the year 2000, I mentioned
18           earlier, that I started taking this ah, some stuff
19           for my stomach and -- to relax because of ah, the
20           stress related from the -- when you're doing your
21           job it's stressful enough and I enjoyed it, but
22           there's amount of stress, but on top of it, it was
23           compounded by the grievance, so it's just a matter
24           of ah, it's extra stress that caused, ah you know
25           stress related, you know physical situations of
```

```
 1            grinding teeth, neck you know stiffness, legs you
 2            know, cramps, ah stomach ah, being upset, ah acid,
 3            you know fighting that situation.
 4      Q    On what basis do you claim you're entitled to this
 5            $50,000 in punitive damages for sexual
 6            discrimination, how are you coming up with that
 7            figure?
 8      A    I try to pick a figure that was ah, reasonable ah,
 9            in that it would be a manner of constructive
10            punishment to those who committed these ah -- these
11            actions.  That they wouldn't do them again.
12      Q    Okay, um and do you still feel that 50,000 is a ah,
13            correct figure for punitive damages?
14      A    At this point, but it's open to negotiation.  But at
15            this point, ah I feel ah -- ah if they don't wanna
16            settle?  Then ah, that means that they might -- they
17            probably do it again, so I feel it's needed -- it's
18            necessary.
19      Q    What, um -- you make different claims under each of
20            -- in your prayer you have each cause of action and
21            then you have monetary figures below each cause of
22            action.  Are you alleging that you're entitled to
23            that amount for each one of those various causes?
24            Or are these just...
25      A    I think it's--
```

1   Q   ....severally or individually or ah, jointly?

2       What's the--

3   A   If it's -- if it's repetitive, I think a judge will

4       determine that and say that.  When I set it up,

5       again I'm pro se and ah, so again, ah I take the

6       approach of putting it all in and other things be

7       removed if it's proper or legal.  So, anything that

8       is out of line, I would not object to having

9       removed, you know if a judge pointed that out.

10   Q   How do you feel about NMC at this stage?

11   A   I feel more and more ah, relieve the part of it that

12       they got hopefully rid of this La Fiesta situation

13       because I know the drain was hard on the students

14       and the staff because they would talk to me a lot

15       about it and so I -- I felt a connection, so.  And

16       then they always bring up, I guess you're vindicated

17       now and I go, well--

18   Q   Who's they?

19   A   Various people in the street.  Ah friends of mine.

20       Just people on the street.  Some I don't even know,

21       they walk up, so I ah -- I don't -- I'm working now

22       at the Attorney General's Office and I enjoy the

23       work I do there and ah, I think I'm helping society,

24       I -- I enjoy that type of position where I'm trying

25       -- I think I'm helping society doing my part as a,

1       you know civil servant.

2           In the college, I have -- I still have a lot of

3       friends there and I ah -- we talk, you know they

4       converse and they wish me well and they've ah, wish

5       at times I was back there and at times I wish I was.

6       Ah, I enjoyed it tremendously.  I think it showed in

7       the ah, time I spent on weekends?  Ah, my own money

8       I spent?

9   Q   How many hours do you think you spent a week at your

10      employment at NMC on an average?

11  A   Because I had night programs, ah 10 hours?  Ah say

12      60, 60 plus.

13  Q   That's an average week for you, devoted 60 hours to

14      your job at NMC?

15  A   Ah, yeah, summer time when we have no programs, of

16      course, we cut back to the regular hours.

17  Q   Which would be 40?

18  A   Approximately.  I was under -- considered a

19      professional?  And no time clock and ah, you just

20      put amount -- the amount of hours than it was to

21      take care of your job and it was flexed, and so the

22      fact that I had programs all through the day and

23      night and even on the weekends, ah it was just

24      ...[unintelligible] I'd be there.  And, you can ask

25      my wife because she complains because even now at my

-236-

```
 1              current job, to stay ahead of the game, ah at the

 2              AGO's office I go in over the weekends, some I get

 3              comp time.  But I just feel like you should stay

 4              ahead of the game, especially we have deadlines in

 5              Criminal Division, it's pretty hectic.  I think

 6              you're aware of that.

 7     Q   Do you enjoy your work now at ah, the Attorney

 8              General's Office?

 9     A   Yes.

10     Q   Is that a full-time position?

11     A   Yes.

12     Q   Um, what is your salary there now?

13     A   I was just ah, promoted to a paralegal status and I

14              went from 20,000 a year to 35.

15     Q   And your final -- your final ah, salary at NMC when

16              you were terminated there was 58?

17     A   Ah, it was 52 base, 51 700, something like that? But

18              again, every year we got some ah, I don't know what

19              it was, we get an extra lump in our paycheck for

20              some, I don't know what really, it was a program of

21              like a back, like steps?  I don't know what it was,

22              but I -- when I looked at my ah, returns, ah because

23              I was thinking of retirement and my three highest

24              years, of course, ah I saw that I was like one year

25              58, then 55 or 54, so.  But my base was 51 plus.
```

-237-

1        MR. SMITH:  Okay.

2    A   I was eligible -- one part was ah, I knew the Board

3        passed a pay scale and as a director with a

4        doctorate, I was entitled to 60,000 and ah, I was

5        asked to challenge it because there was a few of us

6        that had that position or were in that situation and

7        the comptroller who left, this Statesider, he

8        challenged it, but he was leaving and they said ah,

9        you're not -- because a few people were getting it,

10        it made the newspapers, I guess, because a few

11        people were getting it and they weren't qualified,

12        so it's just a matter of ah -- ah I knew I was

13        probably supposed to get 60, but I never.  I enjoyed

14        what I was doing and I thought I was being paid

15        enough with 50 -- 52--

16    Q   Who asked you to challenge it?

17    A   This -- this comptroller, I forgot his name.

18    Q   Some haole that was here?

19    A   Yeah, tall guy?  Older guy?  Because he was privy to

20        the information?

21    Q   Why did he ask you?

22    A   Ah because he said that some people are getting it

23        and others weren't?  And as a comptroller, he said

24        that, you know he'd have to justify?  And ah -- and

25        so he ah, said, challenge it, you're supposed to get

-238-

```
 1              that amount of money, so I said, well, um I just
 2              didn't feel like doing it, I felt, ah I was making
 3              enough as is.
 4    Q        Did he come to you because he knew you challenged
 5              things?
 6    A        No, we just ah -- we talk about golf, he loved to
 7              play golf and -- and ah, he said he was retiring and
 8              I said, you know good luck and everything and he
 9              said, ah something to the effect that ah, you know
10              you should be making more money and I said, well, I
11              heard a rumor, but I don't know anything, then he
12              showed -- he gave me the documents and ah, I think I
13              still have them, but I, like I said at the time I
14              felt I was making enough.
15    Q        Okay.  All right, let me ask you, I'll just show you
16              a document right here, is this -- is this the
17              document, and I'll label that as Exhibit B, I only
18              think we have two exhibits in this deposition, is
19              that the ah, analysis that you put together with
20              the--
21    A        The qualification evaluation worksheet, yes.
22    Q        Okay, does that document, in your opinion,
23              accurately reflect your qualifications?
24    A        Ah--
25    Q        As you determined them to be with the Human
```

1       Resources?

2   A   Well, it's ah, their job, their task, one of their

3       tasks to ah, create this type of worksheet to apply

4       to eligibility lists and ah, I was brought in ah, in

5       November, this was signed off, I guess, the day

6       after I was -- ah, my last official day there, but

7       it was compiled in early November, ah because it was

8       never told to me why I didn't get an interview for

9       the Dean or President's position earlier, besides

10      the lack of post secondary, which I contested, and

11      ah, part of the reason why they -- half of my

12      personnel record, because I worked on Tinian at one

13      time, for some reason I had a split ah, record and

14      ah, some people knew it?  Like Bobby knew how many

15      years and it was a matter that I wanted it

16      officially done, and they knew ah, partly that I had

17      um, you know I asked, I had a claim about my being

18      denied and I wanted to have it done, ah you know

19      exactly and Mr. Aguilar I think in the hearing even

20      asked it to be done because I told them I had more

21      than five and he goes, do you have proof and I said,

22      I don't have, I know I have it in my -- in my bio

23      data, my personnel has the years in there, what I

24      put in my application, but nothing that this -- just

25      I only got a letter back saying you're not -- you're

1          not eligible.  It didn't have a worksheet.  Although
2          I did see one, they showed me one worksheet they had
3          done where it came up at two point seven and they
4          just showed it to me, this is one that we had done
5          during the time that you were applying for the
6          deanship, I said who put it together and I don't
7          think it was even -- I don't think it was signed or
8          not.
9          MR. SMITH: Huh.
10    A    So, ah they said we will ah, make it official.  Ah,
11         that's why Bobby Hunter is like the reviewer and
12         then the approving personnel would be the director,
13         Elsie, and then they even had me sign it that I
14         concur.  And, I accepted the six point three years
15         knowing that I'd be eligible for any position at NMC
16         with the six point three because the most they ever
17         asked was five for post secondary teaching.
18         MR. SMITH:  Okay, I'm gonna mark this as Exhibit B
19    to the depo.
20    A    What was Exhibit A?
21         MR. SMITH: Exhibit A was your settlement with the
22    EEOC.
23    A    Oh, okay.
24    Q    Um, let me ask you just a final question, we've
25         talked before about reinstatement with your current

-241-

1           employment at the Attorney General's Office, do you

2           think that reinstatement to your former position is

3           practicable?

4  A  I'm asking only for reinstatement from the period of

5           November 26th to January 31st. Reinstatement meaning

6           I can't physically work as this in the past, in

7           other words, it would be a reinstatement on paper to

8           where I would get for credit for those year -- a

9           year and two months as vested service. Ah I talked

10          to Retirement and they said, yeah, that would be the

11          way to go because there would be a contribution

12          taken out of my salary and then there would be not,

13          you know 52 paychecks issued, just one reflecting

14          my, you know contributions to the Retirement Fund,

15          then whatever is left over ah, in salary, ah that I

16          would ah, retain for, like I said earlier, I wanna

17          pay off ah, three loans that were taken out, ah my

18          wife and my daughter.

19  Q  Took loans out on your behalf?

20  A  Well, my daughter, ah provided her paycheck for ah,

21          over a year to the family in the amount of 10,000

22          and then my wife, ah she ah, went through her

23          $10,000 savings account and took out a $10,000 loan

24          for us to survive, so, that's 20 plus -- that's

25          about 30. So, I figured with the year's salary and

```
 1            the deductions and everything, it would leave me
 2            about that amount to pay off those ah, and that's
 3            all I would want, and I'd continue at the ah, AGO
 4            and I'm not even asking for the difference between
 5            35 and 52 for from February -- even 20, as I'm only
 6            making 20 for the past eight months.  I'm not asking
 7            for that difference.  I think it's being fair.
 8            MR. SMITH: Okay.
 9      A     And I hope you can relay that to the Board.  I just
10            wanna be fair and put this thing behind us.
11            MR. SMITH:  We will conclude this deposition, unless
12      you have questions, Dan?
13            MR. AGUILAR:  I have no questions.
14            MR. SMITH: Okay, um again it's October 5ᵗʰ, 2004 and
15      the time is 2:32 and this concludes the deposition of ah,
16      Mr. Jack Angello.  Thank you.
17                         ***END OF DEPOSITION***
18
19
20
21
22
23
24
25
```

1

2

3

4

5

6

7

8                           C E R T I F I C A T E

9           I, **John (Jack)Angello,** do hereby certify and declare

10     under penalty of perjury that I have read the foregoing

11     transcript of my deposition taken on September 30 and

12     October 5, 2004, and that the questions asked of me and

13     answers given by me are true and correct, [with|without]

14     corrections indicated on the following page(s).

15           Executed at _____ this _____

16     day of _____, 2005.

17

18

19           _____

20                       John (Jack) Angello

21

22

23

24

25

-244-

REVISIONS TO DEPOSITION

NAME OF DEPONENT:___John (Jack) Angello_____

CASE NO: _____Civil Action No. 03-0014_____

DATE OF DEPOSITION:_September 30 and October 5, 2004

Page No./Line No.        Reads            Should Read            Reason Therefor

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

SAIPAN, COMMONWEALTH OF THE   )
NORTHERN MARIANA ISLANDS      )          CERTIFICATION

I, Celina A. Concepcion, of Judicial Services, Plus, do hereby certify:

That the foregoing deposition was taken by tape recording at the time and place herein set forth and the deponent duly sworn;

That the foregoing pages is a true and correct record of the testimony of the deponent made at the time of the examination recorded and transcribed by me to the best of my knowledge and ability;

That I am not of counsel or attorney for any of the parties in the above entitled matter, nor a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of said matter;

That the deponent, through counsel, has been notified this date of the completion of the transcript for review and signing, the original of which is hereby filed by us with the Law Offices of Vicente T. Salas.

Dated this __11th__ day of January, 2005.

*Celina A. Concepcion*

Note:  3:40 p.m., 1/13/05, call rec'd - not ordering copy
       of transcript.

December 7, 1999

<u>VIA FAX #(808) 541-3390</u>
<u>pages: 4</u>

**Mr. George Chun**
EEOC Investigator
EEOC Hawaii Office
Prince Kuhio Federal Building
P.O Box 50082
300 Ala Moana Dr.  Room 7123A
Honolulu, HI 96850-0051

Re:   EEOC Charge #378980336

Dear Mr. Chun:

Please be advised that the Northern Marianas College (NMC) and I have come to an amicable agreement---with certain reservations about my future protections---concerning my EEOC Charge filed with your office.

Therefore, at this time, I kindly ask your office and Director to prepare a "Withdrawal of Charge with Benefits" in the above matter.

In the attached agreement, items 1 and 2 have been accomplished with the payment of $5708.01+ in backpay; however, item 3 has not been fully realized.  To wit, the training for sexual harassment (including training for females) has not been scheduled, but I plan to contact our Human Resources Officer and ask him to request your office for assistance if this is not carried out in a timely fashion.  In regards to retaliation, my contract will be scheduled for renewal next August (eight months away), and the fact that my June, 1999 evaluation has not even been scheduled to this date has me already wondering about my status here at NMC.

Please be advised that the President Emerita of our college, Ms. Agnes McPhetres, was most gracious and fair in the handling of the aforementioned agreement and, furthermore, she has recently retired on December 4, 1999.  In this regard, let it be known that some NMC administrators here at the college tried to adversely affect the attached agreement, and this rancor will surely carry over to next year.

In closing, I sincerely appreciate your support and expeditious handling of this EEOC matter.  All I ever was after was fairness in this

EXHIBIT
*A*

page two


situation, and your understanding and decisive measures did ensure that fairness became the prevailing ingredient of the outcome of this matter. I will also hold you to your promise that my NMC future is handled in a fair manner, too.

Thank you,

John A. Angello, Ed.D.
P.O. Box 501149
Saipan, MP 96950

attachments

# Northern Marianas College
## Human Resources Office

November 12, 1999

MEMORANDUM

TO:        President

FROM:     Director, Human Resources Office

SUBJECT:   RECOMMENDATION FOR SETTLEMENT - GRIEVANCE FOR
             DR. JACK ANGELLO

The following issues have been discussed with Dr. Jack Angello and he has concurred by his signature.

1. <u>Item No. 3. One step increase for the new position of Director of Technical Trades/Special Projects.</u>  We have concluded our review of the updated job description for the new position (see attached).  In comparison with the earlier position description of which his current classification and salary is based, it is in our finding that this new position has not substantially increased in scope or responsibility.  However, in the review of the files we found a 2/04/97 approval for a step increase based on work assigned.  The attached personnel actions will rectify the situation.

2. <u>Item no 5. Teaching NS301 during Spring 1999 nearly half of the semester before requesting to be relieved due to "unnecessary administrative pressure and personal problems that I had to endure."</u>  Upon review of the matter in detail, including review of medical records and discussion with relevant department of education personnel it is our recommendation that he be compensated for the portion of the semester that he actually taught.  While we agree with the Dean of Education's recommendation of 3/15/99 that this type of sudden drop of classes should have no place in the institution we have medical documents to show that he was having back problems.  He is requesting and we are in support of the payment of 45% of the class or $900.00.  He is requesting that this amount be applied to his outstanding account for the Lab School Spring 1999 tuition for his son Tony.

   3.  In our recent discussions with Dr. Angello, he has re-iterated his concern for two issues to be included in this settlement: a) that the above actions are done based on mutual agreement and should not be used in any way to retaliate against him, b) that there is a need to conduct training on sexual harassment for both male and female employees of the College.  We agree and support his concerns and would like to recommend immediate action on the latter concern.

We feel the above recommendations have been made to comply with current policies of the Board and is fair and equitable.  Dr. Angello has been appraised of this communication and has affixed his signature on this memorandum to signify his full agreement to the actions being taken.

Please indicate your approval on the line provided below.

Kohne K. Ramon


Approved: _____    11/15/99
          Agnes M. McPhetres, President            Date


Concur:  _____    11/12/99
         Dr. Jack Angello Director, VT& SP, CE     Date

DEPO
EX B

## Northern Marianas College
### Office of Human Resources

## QUALIFICATION EVALUATION WORKSHEET

Name _____ JACK ANGELLO _____        Appl / ✓   EE / /

Vacancy / Position _Director, SOE_____        EA / PC # _03-058_

### I.    Comparative Quantitative Summary:  Position vs. Applicant:

|  | Position Requirements | Applicant Qualifications (Full & Partial) ED.D 96 | Comments univ. of southern california |
|---|---|---|---|
| Education: | MA/MS | MA 89 | SJSU (Educ. Instruc. Tech) |
| Experience: | 5 | 6.3 yrs - PST + 6 yrs. pst educ. Admin (8 yrs total w/ PSS) | |
| Others: | | | |

Numerical Comparison

(Substitution)*   Educational Administration = 8 yrs including PSS - 2 yrs PSS  1989 1990
Post-secondary Educational Administration = 6.8 yrs  1996-2002
Post-Secondary Teaching experience = 6.3 yrs.

jac - 9.3.03

### II.    Placement:

a.    Meets Qualifications Requirements?  Yes / ✓    No. / /

b.    If yes, exceeds by how many years / months:  Yrs _____  Mos _____

c.    If no to #1 above, lacks how many years / months:  Yrs _____  Mos _____

d.    Salary (PI and step) qualified for:

_____        11/27/02        _____        11-27-02
Reviewing Personnel Specialist        Date        Approving Personnel Supervisor        Date

Angello 11/27/02

EXHIBIT
B