

# COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

**Juan N. Babauta**
Governor

**Diego T. Benavente**
Lieutenant Governor

The Honorable Heinz S. Hofschneider
Speaker, House of Representatives
Thirteenth Northern Marianas
      Commonwealth Legislature
Saipan, PM 96950

SEP 1 0 2002



The Honorable Paul A. Manglona
Senate President
Thirteenth Northern Marianas
      Commonwealth Legislature
Saipan, MP 96950

Dear Mr. Speaker and Mr. President:

This is to inform you that I have signed into law House Bill No. 13-170, HD1 entitled "To make appropriations for the operations and activities of the Government of the Commonwealth of the Northern Mariana Islands, its agencies, instrumentalities, and independent programs, and to provide budget authority for government corporations for Fiscal year 2003; and for other purposes."

The Thirteenth Legislature successfully enacted an appropriations bill for the Commonwealth government for the first time since September 1998. This is significant in light of the Commonwealth's reduced revenue projections over the last several years, both before and after I came into office. As I stated on May 1st, when I transmitted the proposed Fiscal Year 2003 Budget ("proposed budget"), continued reliance on the spending decisions incorporated in Public Law 11-41 was not only a formula for deficit spending but also inconsistent with the Constitution's mandate that a budget be forged collaboratively by the Legislative Branch and the Executive Branch.

However, I would be remiss if I did not convey my concerns with some of the provisions the Legislature considered and then passed House Bill No. 13-170, HD1 ("HB 13-170"). I believe that a more open, public discussion of the spending needs of the Commonwealth in light of diminished resources would have contributed to a more responsive, even-handed spending plan. As I stated on May 1st, to reach fiscal responsibility, decision



PLAINTIFF'S
EXHIBIT

87

makers in both branches must be mindful of the principle that in the long run no individual interest can prosper unless the Commonwealth as a whole is a vibrant, healthy community and economy.  This is the goal of the Administration.

I am also concerned that the budget plan was enacted based on identified resources that fail to account for recent revenue reducing enactments.  Certain legislative spending mandates absent defined revenue sources or appropriation definitions in light of limited resources could result in deficit.  Further, important programs are once again under funded or entirely unfunded such as:

> ➢ The Department of Public Health cut $994,000 from my recommendation and $3.6 million below actual spending
> ➢ The Department of Public Safety cut $774,000 with $554,000 for police salary increases removed entirely
> ➢ The Department of Public Safety set at $3 million below actual spending
> ➢ The Department of Labor and Immigration operations budget is $1.1 million below actual spending
> ➢ The Marianas Visitors Authority cut by $265,000 at a time we are trying to rebuild our tourist economy
> ➢ The Governor's Education Initiative with seven of eight programs zero-funded
> ➢ The Public School System cut by $1.7 million from my recommendation
> ➢ Utility funding cut to half of its current level - $9.3 million to $5 million, in a lump sum appropriation that fails to abide by the law
> ➢ Judiciary Branch cut by $280,000 from the Governor's recommendation

When I transmitted my proposed budget on May 1st, I set out my plan for returning the Commonwealth to fiscal responsibility while achieving three central and equally valued objectives:

> ➢ Restoration of the Tourism Economy
> ➢ Improvement of the Business Environment
> ➢ Development of Human Resources.

Details were provided as to how the Administration planned to reach each of these goals.

To restore the tourism economy, I proposed efforts focusing on promotion and destination enhancement.  Specific steps were: (1) increased funding for the Marianas Visitors Authority; (2) first-time funding dedicated to a Commonwealth-wide integrated solid waste management system including closure of the Puerto Rico dump; and (3) continued Capital Improvement Project funding to complete the Garapan Revitalization plan and Garapan Watershed Improvement project.

To improve the business environment, the primary objective was to remove the cloud of uncertainty that has cooled investment and commercial activities.  This would require

investing additional resources into the Department of Labor and Immigration ("DOLI") to allay concerns regarding potential actions by the Federal government that could affect terms of trade, availability and cost of labor. It also requires additional funds to end the perception that the local government failed to act with impartiality and to protect persons and property. In short, our plan is to end the threat of Federal take-over by removing the reasons supporting such a take-over. To further efforts in labor and immigration, as well as fight public corruption, prostitution, and make our community safe, increased resources were requested for the Department of Public Safety ("DPS") and the Office of the Attorney General.

To develop human resources, we requested a substantial, continuing investment in education. The Administration adopted the modern theory of economic development that identifies human resources as the single most essential component of development. To this end, we focused on the Governor's Education Initiative with eight (8) identified parts directly benefiting teachers and students: Teacher Tax Credit, Teacher Salary Increase, Teacher of the Year Award, Universal Kindergarten, Scholarship Program, Healthy Students Pilot Program, Performance Improvement Grants, and Development Director Pilot Program. I also requested additional funds for the Public School System ("PSS") in keeping with our commitment.

The budget proposal also included a recommended spending plan supported by detailed analysis for each of the governmental activities funded out of the general fund. I recommended an increase in the Department of Public Health ("DPH") budget to reflect actual expenditures in order to end the chronic under funding of this critical department. I recommended assigning utilities costs to each governmental office to follow the requirements of the law and to encourage conservation. Details regarding recommended spending levels filled close to 490 pages of the budget proposal.

In addition to providing our detailed plan for returning the Commonwealth to fiscal responsibility, the proposed budget clearly identified projected revenues for FY 2003. This detailed revenue projection was based on six (6) months of study. The revenue resources identified in the proposed budget included existing taxes as well as enactment of a modest environmental beautification tax exclusively for funding the solid waste management system.

Over three (3) months after transmittal of our budget, the Legislature took its first public action on the matter. On August 16, 2002, House Concurrent Resolution 13-001 ("HCR 13-1") and HB 13-170 were introduced in the House and passed the same day within hours of introduction. Both were transmitted that day to the Senate. The Senate also passed the two pieces of legislation on August 16, 2002. This flurry of legislative action took place with little debate.

In light of the lack of legislative guidance for the spending decisions set forth in the Appropriations and Budget Authority Act of 2003, it is prudent to further highlight the

most serious concerns of the Administration upon reviewing the legislative package of HCR 13-1 and HB 13-170.

**Revenue Projections:**

HCR 13-1 adopts an expenditure ceiling for FY 2003 of $217,964,866 of which $213,725,973 is available for appropriation for government operations. This number is exactly the amount set forth in my budget proposal of May 1st. However, between May 1st and August 16th, several laws were enacted that affect the FY 2003 revenue projection in my proposal. These laws earmark money from the general fund (and thus, from projected revenue) for specific purposes. This means that the funds are not available for appropriation in HB 13-170. However, HB 13-170 appropriates all of the revenue identified in HCR 13-1 - $213,725,973. By taking this action, the Legislature adopted a formula for deficit spending for FY 2003. The Administration will again face the dilemma of appropriations outstripping resources.

**Appropriation Concerns:**

Administration's Program Initiatives: The Administration's Program Initiatives did not fair well in HB 13-170. Despite the Administration's very detailed program initiatives for reviving the Commonwealth economy, HB13-170 ignores most of them. Further, many of my recommended spending levels ending the formula for deficit, including DPH, DPS, government utilities, failed to be adopted. The practice of chronic under funding of these three areas is carried into FY 2003 under the spending plan enacted in HB 13-170.

**EDUCATION:** As I have repeatedly stated, the best way to grow the economy is to invest in human resources. However, the Legislature instead zero-funded seven (7) of the eight (8) elements of the Governor's Education Initiative.

The Teacher Salary Increase, Teacher of the Year Award, Universal Kindergarten Program, Healthy Students Pilot Program, Performance Improvement Grants and Development Director Pilot Project, each received nothing from the Legislature.

Each of these programs has shown beneficial results when initiated in other school systems.

PSS funding was also reduced by the Legislature. The Lt. Governor and I requested nearly $39 million for PSS but instead, it is allocated only about $37 million. Again, the reasoning for this $2,000,000 reduction is not explained in any manner.

**TOURISM INDUSTRY:** The other important way to grow the economy is to invest in rebuilding the Commonwealth's core industry: tourism. A thirty-one

percent increase for MVA funding would have provided the money needed to bring back our tourists and put money back into the pockets of the private sector. However, again, without consultation or explanation, the Legislature did not fund MVA at $7.3 million as requested. Instead, it reduced the amount by a seemingly arbitrary amount of approximately $300,000.

**IMPROVE BUSINESS ENVIRONMENT:** As with the Education Initiative and Tourism, the Administration's proposal to improve the business environment met a similar fate. DPS and DOLI were denied the recommended increases to adequately address public safety concerns and modernize delivery of services to the business and investor community. Despite promises from past and present legislators regarding raises for police officers, even this recommended increase failed to muster legislative support.

Administration's Spending Recommendations: It is true that the appropriation levels of P.L. 11-41, enacted in 1998, were increased for DPH and DPS. However, these increases are far below what is necessary to provide each of them with the funds needed to provide public services at FY 2003 level of demand and costs. Likewise, the recommended plan for government utilities costs was rejected. The Office of the Governor and Judicial Branch were under funded.

**DPH & DPS:** Our funding recommendations for these two (2) vital departments reflected the middle ground between prior funding levels and actual expenditures. We determined after lengthy discussions that cost cutting actions by DPH and DPS could possibly lower actual expenditures but not by the amount now required under HB 13-170. As I stated on August 16th, this continued pattern by various legislatures of under funding DPS and DPH are the direct cause for prior years' deficit funding and will continue to be for future fiscal years.

In short, for FY 2002, DPH will have an actual expenditure level of roughly $40 million, despite aggressive cost cutting initiatives by the Department since we took office in January. Based on the fiscal reality presented us when we took office, we requested about $38 million, about $2,000,000 under current spending levels. The Legislature reduced this amount by an additional $1,000,000. This leaves DPH roughly $3.4 million in the hole from the start. Public health services, like public safety and education, are basic services expected from the government. The community is not well served by such cuts in such services.

For FY 2002, DPS will have an actual expenditure level of over $16 million. The Administration's budget request was $14 million – an achievable figure that DPS and the Administration believed could be adequate given modest cuts. Again, the Legislature deemed our request too high and cut it by close to $800,000. This leaves DPS facing a $3 million shortfall for FY 2003.

**UTILITIES:** Finally, the third cause for continued deficit spending was identified in our budget as utilities. The Lt. Governor and I strongly believe that laws need to be followed. In this case, Commonwealth law requires that government buildings be metered and charged for their metered consumption. This law has been largely ignored with the government paying a flat rate for utilities without being metered. This practice is in conflict with this Administration's commitment to the environment by encouraging conservation. Flat rate charges not only discourage conservation, they encourage consumption since flat rates do not vary regardless of the amount of power, water, and sewer services consumed. We made our case in our budget submission to fund each government office for utilities and to end the practice of lump sum appropriations against which all government utilities are charged. HB 13-170 continues the practice of giving one lump sum appropriation. In FY 2002, the actual cost for government utilities under this system reached close to $10 million but HB 13-170 provides only $5 million - an anticipated shortfall of $5 million.

**OFFICE OF THE GOVERNOR:** Twenty (20) separate offices and activities, including my personal office and that of the Lt. Governor, comprise the Office of the Governor. These offices and activities provide a wide-range of services to the community. HB 13-170 establishes an FTE ceiling of 249 for the Office of the Governor. Further, total appropriations for all offices within the Office of the Governor decreased by $932,000 from the requested amount in the Governor's Budget. Though moderate when compared to other executive branch departments, the Legislature is silent as to the basis or justification for the decrease.

The bulk of the decrease was in three areas: my personal office operations by nearly 50%, my discretionary account by over 50% and the Special Assistant for Administration operations by nearly 70%. These are substantial cuts given the level of operations demanded of these two offices.

**JUDICIAL BRANCH:** In the Governor's Budget, $569,962 was identified for operations costs for the Commonwealth Supreme Court. This figure reflects a realistic level of funding necessary to provide adequate judicial services to the people of the Commonwealth. However, without explanation, H.B. 13-170 cuts the amount to $271,743, a reduction of $298,219.

Government Operations That Benefit Under HB 13-170. The Legislative Branch, Saipan Mayor's Office and Office of the Washington Representative faired better under HB 13-170 than under the spending recommendations in my proposed budget. Like the cuts in recommended levels, these increases are not explained by the legislative history for HB 13-170.

**LEGISLATIVE BRANCH:**    In my proposed budget, $8,066,181 was recommended to fund the legislative branch.  The legislative branch consists of four entities:  the House of Representatives ("House") with 18 members and staff; the Senate with nine (9) members and staff; the Legislative Bureau which provides logistical support with personnel and operations; and the Youth Congress.  $8,066,181 included the constitutional ceiling for each member of the legislature ($155,000, not including members' salaries.)  It provided for the constitutional ceiling of $400,000 for the presiding officer in each house to be divided with the members of each respective house for standing committee work.  This $400,000 is in addition to the $155,000 each of the presiding officers receives as a member of the legislature.

However, in addition to adopting the recommended ceilings allowed under the NMI Constitution for the House and Senate, HB 13-170 provides an additional $900,000 for employer retirement contributions to the Commonwealth Retirement Fund.  Coupled with this increase in funding, HB 13-170 also increased the FTE ceiling for the House of Representatives by 110 and the Senate by 30 for a total of 310 FTEs from the requested and current number of 170.

I listened with interest to news reports in which the bill's sponsor explained that the increase in FTEs was an increase on paper only since no additional funding for these positions was provided.  However, I note that in terms of real money for personnel, HB 13-170 did just that.  The additional $900,000 for employees' retirement benefits is outside of the constitutional ceiling on funds already given the Legislature.  Thus, HB 13-170 provides, in effect, an additional $450,000 to fill these new FTEs.  Legislators will no longer pay retirement contributions out of their office funds (the $155,000) or from committee money.  Therefore, in reality, the funding for personnel in the legislative branch is effectively increased by nearly $1,000,000 with a total of 310 FTEs – hardly a reduction in the size of government and completely inconsistent with this Administration's goals of performance government.

Finally, H.B. 13-170 gives an additional $670,114 to the Legislative Bureau, thus raising it to the $2,000,000 ceiling in the Constitution.  This is an approximate increase of 50% in the funding level for the Bureau.  Again, more FTEs were established for the Legislative Bureau.  It increased from 26 to 35 – an addition of nine (9) new positions that can clearly be filled with the new FY 2003 money.

The additional Legislative Bureau FTEs bring the total to 347 for the branch as compared to the 249 for the Office of the Governor.

In total, the Legislative branch increased its funding by about $1,000,000 over my recommended level.  But even more telling is that the $9,083,405 appropriated to the legislative branch is $1,827,884 more than actual expenditures for FY 2002.

As with the creation of an additional 149 FTEs for its branch and the absence of any committee report or legislative history, the public will demand to know why the Legislature deemed such an increase in spending prudent in the current fiscal climate.

**OFFICES OF THE MAYOR OF SAIPAN AND WASHINGTON REPRESENTATIVE:** The two remaining areas of note are the increase in funding for the Mayor of Saipan and the increase in funding for the Office of the Washington Representative. Both of these offices receive roughly $400,000 over what was requested in our budget. Again, absent some explanation, it is unclear why these two were singled out for increases in light of the numerous offices being cut by about the same amount of money.

## ITEM VETOES:

I have also found it necessary to exercise my item veto authority pursuant to Article II, Section 7 (a) of the N.M.I. Constitution. The following sections, items or parts of House Bill 13-170 are hereby vetoed for the following reasons:

1. **Section 301. Appropriations for all Activities of the Government of the Northern Mariana Islands.**
At line 21, delete the phrase "subject to the restrictions under section 519(c) and (d) of this Act." This is to be consistent with the item veto of Section 519 in its entirety for the reasons set forth herein.

2. **Section 501. Allotments.**
This section is vetoed in its entirety. The section deprives the Executive of a critical function: the ability to manage appropriations in accordance with actual revenues. It further ignores the need for flexibility in being able to limit allotments. It is an important fiscal tool for controlling spending and avoiding deficit as has been shown over the past nine (9) months.

Subsection (a): This section mandates allotment of 25% of the total amount appropriated to each budget activity at the beginning of each quarter and only provides exceptions for allotments in excess of 25%. This provision creates several difficulties:

First, it is in direct conflict with Section 521 of the Bill mandates that "[t]he Secretary of Finance shall reserve at least 2% of the total fiscal year appropriation for the purpose of retiring the government's accumulated deficit." I believe that deficit reduction is prudent and necessary and I commend the Legislature for allocating funding for that purpose. Section 501 would thwart that purpose.

8

Second, Section 501 (a) (1) (ix), would require full disbursement of appropriated funds to PSS at a quarterly rate of 30%, 30%, 25% and 15%. Such a scheme would create more problems than it could solve. It would cause unnecessary disruption of general fund cash flow with possible cash shortages for essential services and payroll for the rest of the Commonwealth government. Further, the subsection would provide PSS with most of its payroll appropriation months in advance of when they would need it. Based on discussions with PSS, school opening costs are incurred in the 4th quarter, at a time when the entity would receive its lowest funding. I don't believe this plan would effectively assist PSS and only result in disrupting the fiscal operations of the rest of the government.

Subsection (b): This subsection not only limits the governor's ability to adjust allotments for revenue shortfalls, as discussed below, it also singles out the Legislature and the Judiciary for special treatment by limiting the potential budget cuts affecting those two branches to three percent. The subsection would modify the provision of the Planning and Budgeting Act that provides: "Decreases in estimated revenues may be absorbed proportionately by all branches, offices, departments, and agencies of the Commonwealth." 1 CMC §7204(e). This provision has been interpreted by the CNMI Attorney General, to wit:

> "The 'proportionate allocation' rule operates to spread out the fiscal sacrifices, on account of reduced revenues, throughout the CNMI government without exception so long as an entity receives funds appropriated by the Legislature."

Opinion of the Attorney General No. 02-003 (April 22, 2002).

Most importantly, the provisions of Section 501 (b) would divest the Chief Executive's ability to adjust allotments in the event of revenue shortfalls. We have all seen over the last several years just how essential that ability is to continue to operate the functions of government. The Planning and Budgeting Act, in 1 CMC Section 7204 (e) very effectively deals with this eventuality:

> (e)  Upon the effective date of the annual appropriation acts, quarterly allotments shall be issued based on such acts. **The quarterly installments shall be revised quarterly so as to be consistent with projected changes in estimated revenue collections**. (Emphasis added.)

Subsection (b) would substitute a complex scheme that would effectively transfer the control over expenditure of appropriated revenues from the governor to the legislature. It would circumscribe the governor's authority to modify allotments or rescind or defer budget authority by conditioning any such action on legislative

approval. This procedure would constitute a clear violation of the doctrine of the separation of powers.

It is the function of the Legislature to appropriate funds; and it is the function of the Executive to operate the government by responsible expenditure of those funds. Section 501 is an attempt to nullify this principle. Prudent fiscal management mandates that outlays not exceed resources. I believe that the Commonwealth is better served by the existing provisions of the Planning and Budgeting Act that provide for equitable management of actual resources and for mechanisms to minimize deficit spending.

For all of the above reasons, I am vetoing Section 501 in its entirety.

**3. Section 504. Specific Administrative Provisions.**
The following items, parts or subsections of Section 504 are item vetoed:

Subsection (c)(2) is an appropriation for attorney's fees incurred by the plaintiff in Cing v. Tenorio, Superior Court Civil Action No. 95-953. This claim for attorney's fees has been pending since 1995. The plaintiff, in his capacity as a government official and as a taxpayer, brought suit against the then Governor Froilan C. Tenorio and various other government officials to force a certain reprogramming action to benefit Tinian. The plaintiff did not prevail in his standing as a government official and he lost on the merits as well. Any entitlement for payment of his attorney's fees as a government official disappeared when he lost his standing in Court as a government official. Any claim he might have had as a successful taxpayer litigant was lost when the Court ruled in favor of the government. This identical item of appropriation was made by the Tenth Legislature in 1996 and was item vetoed by Governor Froilan C. Tenorio for these and additional reasons. I believe that this item of appropriation is without merit and I am item vetoing it as an improper expenditure of our scare financial resources.

Section (d). This section would proportionately reduce the operations budget for the First Senatorial District by $150,000 for typhoon disaster relief. The need for these funds, however, has been fully addressed by the recent enactment of Public Law 13-21, which reprograms fund balances from various prior appropriations to the Typhoon Chata'an Emergency Fund. Since these fund balances are well in excess of the $150,000 reserved herein, this subsection is item vetoed as duplicative appropriations.

**4. Section 505. Enforcement of Employment Ceilings.**
At line 28, delete the phrase "and filling the FTE is consistent with the restrictions under Section 519." This is to be consistent with the item veto of Section 519 in its entirety for the reasons set forth herein.

**5. Section 506.  Legislative Budget Authority.**

At lines 16 and 17, delete the phrase "subject to section 501 (b) herein." This is to be consistent with the item veto of Section 501 in its entirety.

**6. Section 515.  Maximum Salaries.**

At line 6, on page 19, delete the word "division" after "unclassified" and before "directors". Delete the phrase "of the principal executive departments" on line 21 after the word "directors" and before the words "shall be not". This provision as presently drafted creates inequalities in maximum salaries allowed different directors of executive offices based solely on an arbitrary distinction of whether the office falls inside or outside of an executive department.

It is also troubling to see inclusion of section 514, "Salary Exemption" lifting the cap again for attorneys, CPA's and engineers and Section 515, which raises the salary level for certain directors and deputy secretaries, and Section 516, "Ph.D., J.D., C.P.A. Exemption", in an appropriations act and again without containing the "permanent amendment" language which means that the cap is again lifted but for FY 2003 only. As similar provisions in P.L. 10-41 and P.L. 11-41, it is again unwise and unacceptable. It is also clear that continuing Legislatures believe that the law should be permanently amended. Further, it is questionable that once raised under an appropriations act language what would be the outcome should a future appropriations act not contain it. Do we take back the increase after October 1 of the affected fiscal year? Or do we simply plan for the loss of employees? The Commonwealth Compensation Adjustment Act of 1991 needs to be addressed in its entirety to eliminate this piece meal approach to government service.

**7. Section 517.  Salary Ceilings.**

Section 517 is vetoed in its entirety. This provision is identical to Section 526 of Public Law 11-41 and has been the cause of very unproductive friction between the Legislature and the Governor. The Governor must have the authority, within budgetary limits, to hire competent staff and professionals to manage departments and serve in critical positions. We all understand that the present salary structure for the Commonwealth, which took effect in 1991, is outdated and badly in need of an overhaul. Rather than impose unrealistic limits on gubernatorial authority, a far better approach would be tackle the challenge of revising the salary structure and limits for the entire Commonwealth government. Furthermore, the requirement that the Legislature approve salary levels is effectively a legislative veto of executive expenditure authority which violates the constitutional separation of powers. Therefore, I am item vetoing this section in the hope that the Legislature will seriously consider our entire system of compensation. As the largest employer in the Commonwealth, we owe our people no less. Also, see my comments regarding Section 515 above.

**8. Section 518. <u>Medical Referral Program.</u>**
The following items, parts or subsections of Section 518 are item vetoed:

<u>Subsection (b).</u> This subsection is item vetoed because of the practical unlikelihood of any available funds. The section is neither practicable nor enforceable.. Although this Bill increases the personnel funding level of the Department of Public Health by a little over $4 million, it funds operations $8 million under current expenses. The likely outcome of this scenario will be the necessary reprogramming of personnel funds to operations, with a probable deficit for the department overall by the end of the fiscal year. Neither one of these options provides much hope of "lapsed funds" which would then be allocated to medical referral. It simply isn't going to happen. Historically, off-island medical referral has always run a deficit. In FY 2002, the deficit amounted to $2,480,788. Failure to item veto this subsection would constitute a fraud upon the public. For all my genuine feeling for those in need of medical referral, I refuse to do that.

<u>Subsections (c) and (d).</u> As set forth in the previous paragraphs, funds for medical referral services are always insufficient even to meet even critical needs. Specific hotel accommodations for patients and mandated family escorts are luxuries we cannot afford at this time. The management of scarce resources is better left to the expertise of those who manage the medical referral program. This level of attempted micro management by the Legislature is impractical, unworkable and unproductive. These subsections, therefore, are item vetoed.

**9. Section 519. <u>Other Employment Authority.</u>**
Section 519 is vetoed in its entirety. This matter should be addressed in separate legislation and as permanent law. This section also smacks of discrimination among and between government workers who may be lucky enough to have it apply during the pertinent period of their respective employment and those that may fall through the cracks. It contains provisions that effect the employment status of government workers in general and thus, deserves the attention warranted permanent laws. The purpose of the "one subject" rule is clearly frustrated when matters such as this provision are tucked within the administrative provisions of an appropriations act. Therefore, I am vetoing Section 519 in its entirety.

**9. Section 520. <u>30% Bonus and Lump-Sum Payment of Annual Leave for Executive, Judicial and Legislative Branch Employees.</u>**
I am vetoing Section 520 in its entirety. Simply put, the appropriated amount of $90,000 is totally inadequate given the parameters of the benefit given in this section and in Section 601 of the bill. It is also clearly unwise given the serious consideration being given to reduced retirement benefits. Such amendments are again questionable for the same reasons I stated for vetoing Section 519 in its

entirety. Here it is even more unadvisable given the complexities of retirement benefits legislation and possible impact on the Retirement Fund. I recommend that serious consideration be given to looking at the entire retirement system for government employees before we continue to modify it.

**10. Section 601. Amendment.**

Section 601 is vetoed in its entirety for the reasons set forth for line item vetoing Section 520. Expert review, public hearings, independent comments and other public discussion of such changes in the government retirement system must be undertaken prior to any changes therein. This is especially true in the current fiscal climate and reports regarding the future viability of the Retirement Fund. I encourage the Legislature to undertake a deliberate and considered review of the entire government retirement system so that it may be improved not only for the benefit of present government employees and retirees but to insure its sustainability for future generations.

**11. Section 603. Solid Waste Management Revolving Fund.**

Section 603 is vetoed in its entirety. The Administration fully supports establishment of a solid waste revolving fund to secure money for the operation of an integrated solid waste management system Commonwealth-wide. However, as presently drafted, the language in Section 603 contains troubling provisions that need to be reviewed in a more cohesive manner. It is the Administration's hope that the Legislature will expeditiously enact legislation to not only create a revolving fund for solid waste management but also establish an environmental beautification tax to provide revenue for solid waste management. Therefore, I would like to offer the following specific concerns on the provisions of Section 603:

Subsection (1)(b). The intent of this subsection is clearly to require that all available funds identified for solid waste management be deposited into the Solid Waste Management Revolving Fund. However, as this subsection is presently written, all federal money, regardless of whether it is to fund CIP, FEMA or any other programs must be deposited into the Fund. This is clearly overbroad in its application.

Subsection (1)(c). The intent of this subsection is clearly meritorious. However, as drafted, it is subject to interpretation that would have a devastating impact on the First and Second Senatorial Districts. By mandating that 10% of the revolving fund be reserved respectively for each of these two Senatorial Districts, it appears that the balance of the fund regardless of the source of funding is reserved for solid waste management on Saipan exclusively. In simple language, it means that should Tinian be awarded grant money for solid waste management projects on Tinian, subsection (b) requires that the entire amount of the grant be deposited into the revolving fund. Subsection (c) then provides that

only 10% of the grant is reserved for Tinian with another 10% going to Rota and 80% going to Saipan. This is clearly not the intent of this subsection. Therefore, due to the ambiguity in the language and its potential harmful impact, it needs to be redrafted.

Subsection (1) (d). As written, the language mandating the spending priority over the Saipan sub-account may improperly tie the hands of the expenditure authority in addressing the needs of an integrated solid waste management system for Saipan. The Secretary of Public Works and Solid Waste Management Division require flexibility during this start up period to meet any unforeseen situation as it develops.

Subsection (3). Earmarking funds or reserving funds is not fiscally sound. Moving money around does not create more money. By dedicating 10% of all excise taxes collected under §1402 as this subsection provides, the general fund is denied access to these funds. Further, it appears that the more prudent method would be to pass an amended version of the Environmental Beautification Tax Bill which could provide that revenue collected from that tax would be deposited into the Solid Waste Management Revolving Fund. It is unwise at this time of uncertainty to further deplete the limited resources of the general fund without a simultaneous enacted of the Environmental Beautification Tax to replace earmarked resources.

Although I have legitimate concerns as to the inadequacies of public comments and legislative history, I must repeat that I believe your accomplishment in enacting a budget is admirable. I commend the Thirteenth Legislature for completing its constitutionally-mandated job of enacting a budget, a duty at which previous legislatures have failed. I hope that next year's budget can be properly reviewed and discussed in order to provide the best governmental services to all of our people. The Lt. Governor and I look forward to a beneficial, collaborative effort with the Legislature to provide annual budgets for the Commonwealth and its people.

House Bill 13-170, HD1 becomes Public Law No. 13-24.

Sincerely,

JUAN N. BABAUTA

CC:    Secretary of Finance
       Special Assistant for Management and Budget
       Special Assistant for Programs and Legislative Review



# The House of Representatives

NORTHERN MARIANAS COMMONWEALTH LEGISLATURE
P.O. Box 500586
Saipan, MP 96950

August 21, 2002

Public Law No. 13-24

The Honorable Juan N. Babauta
Governor
Commonwealth of the Northern
  Mariana Islands
Capitol Hill
Saipan, MP 96950
Dear Governor Babauta:

I have the honor of transmitting herewith H. B. NO. 13-170, HD1, entitled, "To make appropriations for the operations and activities of the Government of the Commonwealth of the Northern Mariana Islands, its agencies, instrumentalities, and independent programs, and to provide budget authority for government corporations for Fiscal Year 2003; and for other purposes." The Bill was passed by the House of Representatives and the Senate of the Thirteenth Northern Marianas Commonwealth Legislature.

Respectfully,

Evelyn C. Fleming
House Clerk

Attachment



# HOUSE OF REPRESENTATIVES
## THIRTEENTH NORTHERN MARIANAS COMMONWEALTH LEGISLATURE

Public Law No. 13-24

# HOUSE BILL NO. 13-170, HD1

---

## AN ACT

To make appropriations for the operations and activities of the Government of the Commonwealth of the Northern Mariana Islands, its agencies, P2instrumentalities, and independent programs, and to provide budget authority for government corporations for Fiscal Year 2003; and for other purposes.

---

## In the HOUSE OF REPRESENTATIVES

**Offered by Representatives:** Stanley T. Torres, Jesus T. Attao, and Arnold I. Palacios

**Date:**     **August 16, 2002**

Referred to: N/A
Public Hearing: None
Standing Committee Report: None

### PASSED by the HOUSE OF REPRESENTATIVES

**August 16, 2002**          **on     First and Final Reading**

---

## In the SENATE

Referred to: N/A
Public Hearing: None
Standing Committee Report: None

### PASSED by the SENATE

**August 16, 2002**          **on     Final Reading**

---

Evelyn C. Fleming
House Clerk

**THIRTEENTH NORTHERN MARIANAS COMMONWEALTH LEGISLATURE**

Public Law No. 13-24

**SECOND REGULAR SESSION, 2002**        **H. B. NO. 13-170, HD1**

## AN ACT

To make appropriations for the operations and activities of the Government of the Commonwealth of the Northern Mariana Islands, its agencies, instrumentalities, and independent programs, and to provide budget authority for government corporations for Fiscal Year 2003; and for other purposes.

## BE IT ENACTED BY THE THIRTEENTH NORTHERN MARIANAS COMMONWEALTH LEGISLATURE:

Section 101.  Short Title.  This Act may be cited as the "Appropriations and Budget Authority Act of 2003."

Section 102.  Purpose.  This Act appropriates local funds for the operations and activities of the Government of the Northern Mariana Islands, its agencies, instrumentalities, independent agencies and political subdivisions, and provides authority for government corporations for Fiscal Year 2003 commencing October 1, 2002 and ending September 30, 2003.

Section 103.  Definitions.  As used in this Act:

(a)    Government of the Commonwealth of the Northern Mariana Islands includes:

(1) Legislative Branch, which includes the following:

(A)  Senate

(B)  House of Representatives

(C)  Legislative Bureau

(D)  Northern Mariana Islands Youth Congress

(2) Judiciary Branch, which includes the following:

(A)  Supreme Court

(B)  Superior Court

Public Law No. 13-24

HOUSE BILL NO. 13-170, HD1

1             (i) Family Court

2             (C) Law Revision Commission

3         (3) Executive Branch, which includes the following departments and

4     offices:

5             (A) Office of the Governor

6             (B) Office of the Attorney General

7             (C) Department of Community and Cultural Affairs

8             (D) Department of Commerce

9             (E) Department of Labor and Immigration

10            (F) Department of Public Safety

11            (G) Department of Finance

12            (H) Department of Public Health

13            (I) Department of Lands and Natural Resources

14            (J) Department of Public Works

15            (K) Office of Personnel Management

16            (L) Office of the Public Defender

17        (4) Office of the Resident Representative to the United States.

18        (5)   First Senatorial District (Rota) which includes the following

19     government offices and resident departments:

20            (A) Office of the Mayor

21            (B) Municipal Council

22            (C) Resident Department of Labor and Immigration

23            (D) Resident Department of Community and Cultural Affairs

24            (E) Resident Department of Commerce

25            (F) Resident Department of Public Safety

26            (G) Resident Department of Finance

27            (H) Resident Department of Public Health

28            (I) Resident Department of Land and Natural Resources

29            (J) Resident Department of Public Works

30            (K) Office of Personnel

1          (6)  Second Senatorial District (Tinian and Aguiguan) which includes

2    the following governmental offices and resident departments:

3          (A)  Office of the Mayor

4          (B)  Municipal Council

5          (C)  Resident Department of Labor and Immigration

6          (D)  Resident Department of Community and Cultural Affairs

7          (E)  Resident Department of Commerce

8          (F)  Resident Department of Public Safety

9          (G)  Resident Department of Finance

10         (H)  Resident Department of Public Health

11         (I)  Resident Department of Land and Natural Resources

12         (J)  Resident Department of Public Works

13         (K)  Office of Personnel

14         (7)  Third Senatorial District (Saipan and the Northern Islands) which

15   includes the following governmental offices:

16         (A)  Mayor of Saipan

17         (B)  Mayor of the Northern Islands

18         (C)  Saipan Municipal Council

19         (8)  All government corporations, as defined in 1 CMC § 7103 (n), for

20   which budget authority is herein provided including the following:

21         (A)  Commonwealth Utilities Corporation

22         (B)  Northern Marianas Housing Corporation

23         (C)  Commonwealth Ports Authority

24         (D)  Commonwealth Development Authority

25         (E)  Northern Marianas Retirement Fund

26         (F)  Marianas Public Land Trust

27         (G)  Marianas Public Lands Authority

28         (H)  Marianas Visitors Authority

29         ~~(I)  Commonwealth~~ Telecommunication Commission

(9)  All other public and quasi-public entities, boards or commissions incorporated or established pursuant to the Commonwealth Constitution or Commonwealth law and including the following agencies and instrumentalities:

    (A) Public School System

        (i)  Board of Education

    (B)  CNMI Election Commission

    (C)  Board of Parole

    (D)  Board of Professional Licensing

    (E)  Chamorro--Carolinian Language Commission

    (F)  Civil Service Commission

    (G)  Northern Marianas College

    (H)  Workers' Compensation Commission

    (I)  Office of the Public Auditor

(b)  "Independent programs" means government programs under separate boards established by law (unless receiving appropriations or budget authority under another heading), specialized general items of appropriations, and those non-profit corporations and associations or organizations established outside of the Government of the Commonwealth of the Northern Mariana Islands to which the Commonwealth Government provides financial assistance such as the:

    (1)   Special Annuity for Governor / Lt. Governor

    (2)   National Governors Association

    (3)   South Pacific Commission/ SPREP

    (4)   Marianas Bound (Karidat)

    (5)   Micronesian Legal Services Corporation

    (6)   Agricultural Fair

    (7)   NMI OICC

    (8)   Joeten/Kiyu Public Library (Commonwealth Public Library)

    (9)   Judgments Against Government

    (10)  NMI Protection & Advocacy System

4

Public Law No. 13-24
HOUSE BILL NO. 13-170, HD1

    (11) Flame Tree Arts Festival

    (12) Ayuda Network

    (13) Developmental Disabilities Planning Agency

    (14) Commonwealth Museum

    (15) Domestic Violence

    (16) Cops Universal Hiring Program

    (17) Coastal Resources Management

    (18) Free Trade Zone

    (19) Government Utilities

    (20) 30% Retirement Bonus

    (21) APPU/APIL

    (22) Retirement (PL 8-31)

    (23) Crime Stoppers International

    (24) Public Assistance Program Matching Fund

  (c) "local funds" means locally generated revenues and revenues received pursuant to Section 702 (a) of the Covenant.

  (d) "Operations" means appropriations for all lawful activities other than personnel.

  (e) "Personnel" means appropriations for salaries, employer's contribution to the Northern Marianas Retirement Fund, overtime, night differential, hazardous pay and other employee wages and benefits.

  (f) "Position" or "Full Time Equivalent" (FTE) means the maximum number of persons that may be employed, pursuant to Article X, Section 7 of the Commonwealth Constitution but does not include Workforce Investment Agency, substitute teachers, summer trainees, teacher aides, physicians, licensed professional nurses and licensed allied health providers working part-time and paid only for instructional time, student teacher trainees, or short-term specialized instructors, such as visiting artists, performers, writers, and the like. For purposes of this exception, "part-time" means employment not exceeding 40 hours in any biweekly pay period,

1    and "short-term" means not more than 90 instructional days employment within the

2    Public School System during the fiscal year.

## CHAPTER II. ESTIMATED REVENUES

4    Section 201. Estimated Revenues.

5        a) Local Funds:

6            1) Internal Revenue                                    $ 207,843,973

7            2) Covenant Funds (Operations)                              -0-

8            3) Non-Resident Workers Fee Fund

9                (Public Law 10-66 and 10-1)                 $     5,882,000

10           4) Marianas Public Lands Authority             $     4,238,893

11       b) Total Local Revenue and Resources available

12   for Fiscal Year 2003 (per Governor's Communications

13   for Fiscal Year 2003 dated 5/1/02 and 7/1/02)              $ 217,964,866

## CHAPTER III. APPROPRIATIONS

15       Section 301. Appropriations for all Activities of the Government of the Northern

16   Mariana Islands.    Funds for the programs and activities of the Government of the

17   Commonwealth of the Northern Mariana Islands, are hereby appropriated as follows per the

18   attached appropriation summary worksheets, which are incorporated by reference in this Act.

19   The FTEs identified therein are the maximum number of positions approved and authorized,

20   ~~subject to the restrictions under section 519 (c) and (d) of this Act~~, and shall not exceed such

21   number unless authorized in accordance with Article X, Section 7 of the N.M.I. Constitution.



## CHAPTER IV. BUDGET ADOPTION

Section 401.    <u>Government Corporations and Designated Agencies/Activities</u>. Pursuant to 1 CMC § 7206 and as provided herein, budget authority for the following activities is hereby approved.  Expenditures in excess of the budget authority approved herein for agencies to which public funds are appropriated shall not be incurred or committed, and FTE ceilings approved shall not be exceeded without specific approval of the Legislature by joint resolution in accordance with Article X, Section 7 of the N.M.I. Constitution.

| | ACTIVITIES | FTE | PERSONNEL | OPERATIONS | TOTAL |
|---|---|---|---|---|---|
| 1. | CUC | 384 | 14,408,068 | 53,947,932 | 68,356,000 |
| 2. | CPA | 230 | 7,858,881 | 3,150,891 | 11,009,772 |
| 3. | CDA | 14 | 895,026 | 664,000 | 1,559,026 |
| 4. | NMI Ret. Fund | 33 | 1,487,061 | 43,589,990 | 45,077,051 |
| 5. | NMI Housing Corporation | 18 | 842,518 | 1,383,879 | 2,226,397 |
| 6. | OPA | 49 | 1,812,324 | 416,500 | 2,228,824 |
| 7. | CNMI Gov't Health & Life Ins. | 7 | 305,614 | 8,402,934 | 8,708,548 |
| | GrandTotal: | 735 | 27,609,492 | 111,556,126 | 139,165,618 |

## CHAPTER V. ADMINISTRATION OF APPROPRIATED FUNDS

~~Section 501.  Allotments.  The funds appropriated under chapter III of this Act shall be distributed and allotted by the Office of Management and Budget in accordance with the individual activities' appropriation summary worksheets which are attached hereto.~~

~~(a) Quarterly allotments. The funds appropriated herein shall be allotted at the beginning of each quarter to each budget activity at a rate of 25% of the amount appropriated, except:~~

~~(1)  Quarterly Allotments in excess of 25%.  The following governmental officials may approve a quarterly allotment in excess of the 25% of the total approved operation budget, and the Office of Management and~~

VETOED

7

Public Law No. 13-24
HOUSE BILL NO. 13-170, HD1

VETOED

1      Budget shall authorize the allotment to the expenditure authority consistent
2      with the nature and need of the activity:
3              (i)  The Speaker of the House in the case of the House of
4      Representatives;
5              (ii)  The President of the Senate in the case of the Senate;
6              (iii)  The Director of the Legislative Bureau in the case of the
7      Legislative Bureau;
8              (iv)  The Chief Justice of the Supreme Court in the case of the
9      Supreme Court.
10             (v)  The Presiding Judge of the Superior Court  in the case of
11     Superior Court.
12             (vi)  The Governor in the case of the Executive Branch;
13             (vii)  The Resident Representative in the case of the Office of
14     the Resident Representative to the United States;
15             (viii)  The President of the College, with the written approval
16     of the Chairman of the Board of Regents, in the case of the Northern
17     Marianas College;
18             (ix)  The Commissioner of Education, with the written approval
19     of the Chairman of the Board of Education, in the case of the Public
20     School System.  Notwithstanding any provision of law or this Act, the
21     Department  of  Finance  shall  disburse  in  full  to  the  expenditure
22     authority over funds appropriated to the Board of Education and the
23     Public School System as follows;
24             (A)  30% in the First and Second Quarter of the Fiscal
25     Year;
26             (B)  25% in the Third Quarter of the Fiscal Year; and
27             (C)  15% in the Fourth Quarter of the Fiscal Year.
28     In the event allotments greater than 25% are approved, allotments in
29     subsequent quarters shall be reduced below 25% to the extent necessary so
30     that total allotments do not exceed 100%.

8

VETOED

1   ~~(b)  Notwithstanding any law to the contrary, if a revenue shortfall at anytime~~

2   ~~during Fiscal Year 2003 triggers the application of 1 CMC § 7604 (c) and/or § 7605~~

3   ~~and if the Governor invokes his authority to modify allotments, or to rescind or defer~~

4   ~~budget authority under § 7604 (c) and/or § 7605, such modification, rescission or~~

5   ~~deferral, shall take effect only after the Governor files a report, with the Presiding~~

6   ~~Officers of the Legislature and the Chairmen of the legislative fiscal committees,~~

7   ~~describing the change in circumstances which makes it necessary that reductions in~~

8   ~~budget authority should be made or the basis for his determination that estimated~~

9   ~~budget resources will be insufficient to finance all appropriations in full;  provided~~

10  ~~that such report shall be accompanied by a plan to be implemented modifying~~

11  ~~allotments or rescinding or deferring budget authority, to the extent necessary to~~

12  ~~prevent a deficit.  Provided further that no modification of allotment authority, or~~

13  ~~rescission or deferral budget authority shall cause a reduction of the total funds~~

14  ~~appropriated to the Legislature and the Judiciary by more than 3% of the total~~

15  ~~appropriated funds of each of those branches notwithstanding any law to the contrary;~~

16  ~~the plan to modify allotments, or to rescind or defer budget authority, shall take effect~~

17  ~~upon the Legislature's authorization of the Governor's plan and shall remain in effect~~

18  ~~until there is either an appropriation act providing additional budget authority or an~~

19  ~~appropriation act providing budget authority in a subsequent fiscal year.~~

20  Section 502.  Appropriation Worksheets.

21         (a)  Unless otherwise provided in this Act, the funds appropriated pursuant to

22  section 301 hereof shall be expended in compliance with the appropriation summary

23  worksheets attached hereto and incorporated by reference herein, and in accordance

24  with the fiscal authority the listed agencies have pursuant to statute and the

25  administrative provisions of this act.  If there is any conflict between the attached

26  worksheets and the administrative provisions of this Act, the administrative

27  provisions shall prevail.

28         (b)  The budget worksheets contained in the Governor's budget submission to

29  the Legislature have no force or effect of law.  The Special Assistant for Management

30  and Budget and the Director of Personnel are without authority to grant, withhold, or

1     condition any approval or allotment based on those worksheets or any other source

2     other than this Act and other applicable law. All personnel actions for civil service

3     positions, including but not limited to new hires, transfers, promotions, and pay

4     increases, shall be made in compliance with the Civil Service Act and regulations and

5     other applicable law concerning public employment and personnel management for

6     the Commonwealth Government.

7     Section 503. Suspension of Customs/User's Fee Earmarking. The operation of the

8     provision of 4 CMC § 1421 that reads, "[n]o less than five percent of the amount [of user

9     fees] collected shall be reserved for use by the Division of Customs Services without further

10    appropriation" is hereby suspended.

11    Section 504. Specific Administrative Provisions.

12         (a) Scholarship Program Budget Authority. Notwithstanding any provision of

13    law, the appropriation to the Scholarship Office shall be available without fiscal year

14    limitation and shall not be reprogrammed.

15         (b) Government Utilities Budget Authority. Notwithstanding any law to the

16    contrary, the funds appropriated for government utility expenses shall include

17    government consumption of power, water, sewer and expenditures incurred for public

18    streetlighting and shall be available without fiscal year limitation and shall not be

19    reprogrammed.

20         (c) Judgments Against the Government Allocation and Reprogramming

21    Authorization.

22            (1) There is hereby appropriated the sum of $31,138.68, from the

23    total appropriation for Judgments Against the Government to pay for

24    attorney's fees (Eric Smith, Esq.) as ordered in Superior Court Civil Action

25    97-486. Provided further that in the event of a settlement in Civil Action 97-

26    486 approved by the Office of the Attorney General, the Governor shall

27    reprogram funds to satisfy any government obligation required by the

28    settlement agreement.

29    ~~(2) No more than the sum of $37,258 shall be reserved from the~~

30    ~~appropriation for Judgments Against the Government to pay plaintiffs' legal~~

VETO'D